## Staunton.

## CARTER COAL COMPANY V. BATES.

### September 16, 1920.

1. SERVICE OF PROCESS—*Defective Return—Case at Bar.*—The original writ of summons commencing an action for personal injuries sustained by a miner was issued by the clerk in August, 1918, and was made returnable to the first October rules, 1918. At its return day this process was in fact returned by the officer as "executed," per the endorsement of his return thereon "on the 14th day of August, 1918, in Tazewell county, by delivering a true copy of the within summons to A. Rowen in person, who is superintendent of the within defendant corporation in the county of Tazewell, in which county the said A. Rowen resides."

   *Held:* That this return of such process as "executed" was on its face manifestly defective.

2. SERVICE OF PROCESS—*Alias Writ—Statute of Limitations—Case at Bar.*—In the instant case there was a defective return to the original summons commencing the action issued in August, 1918, returnable to the first October rules, 1918. On the 14th day of November, another writ of summons was issued, made returnable to the third December rules, 1918. The latter process, prior to its return day, was executed in a legal manner and was duly returned endorsed by the officer as so executed. On the 4th of December, 1918, upon special appearance and motion of the defendant, the original process and return thereon were quashed. Defendant contended that the second process could not be regarded as an alias process, because it was not issued at the return day of the original process, but must be regarded as an original process commencing a new cause of action after the expiration of the one year from the date of the injury. There was no defect in the original process itself; at its return day it was returned "executed" by the officer, although in a defective manner. The defect was only in the service and return of the writ.

   *Held:* That the original writ so returned sufficed to keep pending the action commenced thereby, without any *hiatus,* until

the return thereon was quashed by the court, and that the second writ being issued prior to the quashing of the return on the original writ, and having been duly served and returned, there was no *hiatus* in the action which could operate as a discontinuance thereof.

3. SERVICE OF PROCESS—*Alias Writ—Statute of Limitations—Case at Bar.*—Under the circumstances set forth in the second syllabus, the second writ in the case must be regarded as an alias and not as an original writ commencing the action. The action was commenced by the original writ, and suffered no discontinuance prior to the issuing of the second writ.

4. SERVICE OF PROCESS—*Alias Writ—Code of 1919, Section 6059.*—Under section 6059, Code of 1919, it is made the *ex officio* duty of the clerk, unless otherwise directed by the plaintiff or his attorney, to issue alias and pluries process in all cases at the return day of the next preceding process if the latter be not on that day returned executed, thus fixing expressly the time at which all alias and pluries processes must be issued in all cases which have arisen since the new Code went into effect, and which may arise in future.

5. MINES AND MINERALS—*Lights on Trains of Cars in Motion.— 4 Pollard's Code (1916), p. 833.*—An instruction of the mine foreman to the brakemen, with carbide lights in their caps, on cars operated by machinery hauling in a mine, to ride on the front end of each trip of cars, did not "provide * * * for the carrying of a conspicuous light on the front * * * of every trip or train of cars when in motion," as required by the statute. 4 Pollard's Code, p. 833.

6. MINES AND MINERALS—*Lights on Trains of Cars in Motion.— 4 Pollard's Code (1916), p. 833.*—To be a provision such as is required by the statute (4 Pollard's Code, p. 833), it should be a provision for a light affixed or hung on the front of the trip or train of cars itself, in such a manner that it will shine ahead.

7. MINES AND MINERALS—*Instructions—Lights on Cars in Motion— Harmless Error.*—In an action against a mine operator for injuries to a miner, the jury were insructed that defendant was liable if plaintiff was injured by a train of empty cars running in the mine without having a conspicuous light on the front of the train. It was objected that the statute (4 Pollard's Code, p. 833) provides that it shall be the duty of the mine foreman to *provide* for the carrying of a light on the front end of the train, whereas the instruction told the jury the defendant was liable if the light was not there.

*Held:* That abstractly the objection was well taken, but such

error was immaterial and harmless in the instant case, since there was no evidence that the company *provided* for a light on the front end of the train.

8. MINES AND MINERALS—*Assumption of Risk—Continuing Work with Knowledge of Danger.*—Plaintiff, by continuing his work in a mine, after knowledge of the breach by the company of its statutory duty of providing for the carrying of a conspicuous light on the front of every trip or train of cars (4 Pollard's Code, p. 833), did not assume the risk of injury from such breach of duty by his master.

9. MINES AND MINERALS—*Assumption of Risk—Abolition—4 Pollard's Code, p. 833.*—The common law doctrine of the assumption of risk may be abolished by statute with respect to any duty of the master; and by necessary implication such is the effect of 4 Pollard's Code, p. 833, providing for lights on cars operating by machinery in a mine. The statute cannot be nullified by the systematic violation of it.

10. INSTRUCTIONS—*Repetition.*—Where in an action by a miner for injuries the jury were sufficiently instructed on the subject of contributory negligence, the giving of further instructions on that question would have been a needless multiplication of instructions and was properly refused.

11. EVIDENCE—*Admission—Rebuttal Evidence.*—In an action by a miner for personal injuries incurred while attempting to couple cars in motion, on cross-examination defendant elicited from one of plaintiff's witnesses the statement of the opinion that if the motor was running as much as four miles an hour when plaintiff attempted to make the coupling, it would have been too dangerous for him to have attempted it. Plaintiff was allowed in his testimony in rebuttal to make the following statement: "I was moving very slowly, I couldn't say just exactly, but it was very slow."

*Held:* That plaintiff's testimony was plainly admissible under the rules applicable to rebuttal evidence.

Error to a judgment of the Circuit Court of Tazewell county in an action of trespass on the case. Judgment for plaintiff. Defendant assigns error.

*Affirmed.*

This is a personal injury case in which the defendant in error was plaintiff in the court below, and recovered a verdict against the plaintiff in error, the defendant in the court below, for the sum of $1,200 for the loss of the end of the thumb of his left hand, which was crushed in a certain operation of a gathering motor and the car following it, in the coal mine of the plaintiff in error.

The parties will be hereinafter referred to as the plaintiff and company, respectively.

The following statement, taken from the petition for the writ of error, correctly sets forth the chief material facts:

"Plaintiff, a miner of nineteen years experience in mine work, was engaged in mining coal, under contract with defendant, at its No. 2 mine at Seaboard, in Tazewell county. By the terms of his contract plaintiff was mining coal in the main heading, and on third right and fourth left cross-entries, and hauling the loaded cars of coal so mined by him and his men with a gathering motor to a point on the main entry about 100 feet beyond the mouth of second right entry going in. At this point of delivery the loaded cars were gotten by the main line motor and hauled to the drift mouth. It was also a part of the plaintiff's work to haul the empty coal cars from the point where they were placed by the main line motor to the various working places of the miners in his employ. These empty cars were placed on what was known as second right entry. Plaintiff had in his employ a number of miners and also a brakeman for the gathering motor operated in connection with his work. He was paid $1.22 per car for the coal mined by him and his men and delivered to the company at said point of delivery. Out of this amount he had to pay the men employed by him such wages as he agreed to pay them. This was done by his turning in to the company the amounts his men were entitled to receive, and the company paying for him direct their respective wages.

"The injury complained of occurred about three or four o'clock in the afternoon of September 6, 1917. Plaintiff had five or six miners and a brakeman working for him that day. He himself was running the gathering motor, hauling the empty cars to the working places and the loaded cars to the point of delivery in the main entry. He had already made about four trips that day for empty cars to second right entry where the empties were placed by the main line motor. His men had loaded all their empty cars and were waiting for other cars. One of his miners, Henry Hess, had quit work for the day. He was anxious to get more cars to his men so that more cars could be loaded, and he and his brakeman, Arthur Johnson, started for more empty cars. They ran the gathering motor down beyond the switch at the mouth of second right, stopped the motor, Johnson got off and threw the switch, and went up ahead of the motor into second right. The plaintiff reversed his motor and backed up a distance of thirty or forty feet to the empty cars standing in second right. He then stopped and coupled the empty cars to his motor, making the coupling, according to plaintiff's statement, in the top slot in the motor because the cars were standing just over the crest of a grade, and the coupling could not be made in the second slot (the usual one for the coupling). At this time the front end of the motor was still on the main entry. All the empty cars in second right were then pulled up a distance of three car lengths (about 30 feet) and stopped again. The brakeman went to the end of the cars next to the face of the coal and "scotched" them, then came back and uncoupled three empty cars from the rest of the empty cars, and the motor again started out with the three empty cars.

"No one but the plaintiff himself was an eye-witness to the accident. The plaintiff states that it was necessary to change the coupling that he had made in the top slot to

the second slot in the motor, and that he was trying to change the coupling and make it in the second slot, using his left hand, while both the motor and the cars following it were running; that he had uncoupled the motor from the cars, and while engaged in attempting to again couple he heard a noise ahead of him, and, looking ahead, he saw the main line motor pushing a trip of empty cars; that the end of the trip was within about twenty feet of his motor, and he, in order to prevent a collision, reversed his motor, leaving his left hand, with which he was trying to make the coupling, between his motor and the car following it, and the car ran up on it and caught the end of his thumb between the motor and the car and mashed off the first joint of it.

"At the time of the accident the motor, according to plaintiff (in his testimony in chief) was 'going slow', 'about like a man would walk.' It was running down grade —the grade at the mouth of second right entry being two per cent and a little further down the grade being three per cent. Plaintiff consumed about three minutes of time in backing up into second right, getting the empties and running out before the accident.

"The main line motor was coming in with about ten or eleven empty cars, at a speed of five or six miles an hour. The cars were being pushed in by the motor. The only light on the * * * trip going in was the carbide light on the brakeman's cap. The brakeman was required to ride on the end of the trip. At the time of the accident in question he was on the second or third car from the end of the trip going towards the end, and had a carbide light in his cap. The light was burning. * * * The main entry at the mouth of second right was about thirteen or fourteen feet wide, sixty inches high, and was straight for a distance of about 300 feet going towards the mine mouth. The main line motor weighed eight tons, and the four gathering motors

which were then being operated in that mine each weighed five tons. The motor tracks were laid of steel. The motors were operated by electricity transmitted through a copper wire about one-half by five-eighths of an inch in size, running along the entries and suspended from the roof thereof. This electric wire was about eighteen inches above the top of the motorman's head as he sat at his usual place on the gathering motor. As a motor approached a man could ordinarily hear the electric wire 'singing' for a distance of 300 to 500 feet.

"Ordinarily a person could hear the noise from the approach of the main line motor at the mouth of second right for a distance of 300 feet. At the mouth of second right a person could ordinarily see a carbide light, such as was used in that mine, on the main entry, for a distance of 250 or 300 feet (R. p. 56.) There was no smoke along the main entry at this point because the intake of air was towards the heading and kept the entry clear."

To the foregoing, the following should be added:

The statute (4 Pollard's Code, p. 833), so far as material, provides as follows: "On all haulways where hauling is done by machinery of any kind, the mine foreman shall provide a proper system of signals, and for the carrying of a conspicuous light on the front, and a light or flag on the rear of every trip or train of cars when in motion; provided, that this shall not apply to trips being hauled by gathering motors or mule teams when operating on other than main headings."

The only provision which the company made to comply with this statute on the subject of the light, was that its mine foreman instructed the brakeman on the cars operated on the main haulway, who wore carbide lights in their caps, to ride on the front end of each trip of cars.

The motor which the plaintiff was operating and the cars following it, made some noise. The plaintiff did not hear

any singing of the wire occasioned by the approach of the main line motor, nor any noise of the approach of it or of its train of cars, until the front end of such cars were within a few feet of the motor which the plaintiff was operating. Nor did the plaintiff see the carbide light in the cap of the brakeman on the main haulage train. The plaintiff and his brakeman also had carbide lights on their heads; and the motorman and brakeman on the main haulway train did not see the carbide lights on the heads of plaintiff or of his brakeman, nor hear the noise of the motor being operated by the plaintiff.

After the company had on cross-examination elicited from one of the plaintiff's witnesses the statement of the opinion to the effect that if the motor was running as much as four miles an hour when the plaintiff attempted to make the coupling, as aforesaid, it would have been too dangerous for him to have attempted it while the motor and cars were in motion, and that the witness "would have to be in mighty tight place" to attempt such a coupling when he was running as much as three miles an hour, the plaintiff was allowed in his testimony in rebuttal to make the following statement: "I was moving very slowly, I couldn't say just exactly, but it was very slow."

Whether the method of coupling adopted by the plaintiff, with the motor and cars in motion, was a proper method— the most practical method under the circumstances and one reasonably safe—was a much controverted question in the case. It would serve no useful purpose to us to set out the testimony on this subject in detail. It is sufficient to say that there was ample testimony to sustain the verdict of the jury in finding that the method adopted was reasonably safe and did not constitute contributory negligence on the part of the plaintiff. Practically the only testimony to the contrary was that elicited from the witness for plaintiff on the cross-examination aforesaid as to his opinion of the

75

speed at which such a coupling could be attempted without unreasonable danger.

The further material facts are stated in the opinion below.

*Chapman, Peery & Buchanan,* for the plaintiff in error.

*Greever, Gillespie & Divine,* for the defendant in error.

SIMS, J., after making the foregoing statement, delivered the following opinion of the court:

The material questions raised by the assignments of error will be disposed of in their order as stated below.

1. Is the plaintiff's action barred under the statute of limitations requiring it to be instituted within one year after the injury complained of occurred?

In our opinion this question must be answered in the negative.

[1, 2] The injury complained of occurred in Tazewell county on the 6th day of September, 1917. The original writ of summons commencing the action was issued by the clerk in August, 1918, and was made returnable to the first October rules, 1918. At its return day this process was in fact returned by the officer as "executed," per the endorsement of his return thereon "on the 14th day of August, 1918, in Tazewell county, by delivering a true copy of the within summons to A. Rowen in person, who is superintendent of the within defendant corporation in the county of Tazewell, in which county the said A. Rowen resides." This return of such process as "executed" was on its face manifestly defective, under the statute in such case made and provided, and was subject to be quashed for that reason. On the 14th day of November, the plaintiff sued out and there was issued by the clerk a second writ of summons,

in form an alias writ of summons, made returnable to the third December rules, 1918. The latter process, prior to its return day, was executed in a legal manner and was duly returned endorsed by the officer as so executed. Meanwhile, on the 4th day of December, 1918, upon the special appearance of the defendant company, by counsel, and its exception to the said original process and the return thereof, and motion seeking such relief, the court sustained such motion and ordered "that the said (original) process and the return thereon be and the same are hereby quashed."

The statute on the subject of *alias* and *pluries* process, as it stood at the time this case arose, is contained in Code 1887, section 3221, and is as follows:

"If at the return day of any process, it be not returned executed, an alias, or other process, may be issued, without waiting (when the first process is returnable to a term) for the subsequent process to be awarded at rules; and where, for want of a return of the first process against a defendant, subsequent process is issued, if the former was executed the officer shall not execute the latter, but shall return the former, if it be in his possession, and if it be not, shall return the latter with an endorsement of the execution of the former, and the proceedings thereupon shall be as if the first had been duly executed."

The position of the company is that under this statute the second process cannot be regarded as an alias process, because it was not issued at the return day of the original process, but must be regarded as an original process commencing a new action after the expiration of the one year from the date of injury; that the statute requires all alias process to be issued "at the return day" of the original process; and that otherwise there is a *hiatus* in the action which operates as a discontinuance of it; and Burks' Pl. & Pr., pp. 290-291; 20 Encl. Pl. & Pr., p. 1179; 32 Cyc. 446; *United States* v. *Parker*, 2 Dall. 373, 1 L. Ed. 421, 423; *Col-*

*ling* v. *McGregor*, 144 Mich. 651, 108 N. W. 87; *Koonce* v. *Pelletier*, 115 N. C. 233, 20 S. E. 391; and *Noell* v. *Noell*, 93 Va. 433, 25 S. E. 242, are cited to sustain such position.

There is thus presented a very interesting question and one not free from difficulty. But, confining our holding to the precise facts of the case before us, which are, in substance, to the effect that there was no defect in the original process itself; that at its return day it was returned "executed" by the officer, although in a defective manner, as aforesaid; and that the defect was only in the service and return of the writ; we are of opinion that the case is ruled by the decision of this court in *Virginia Fire & Marine Ins. Co* v. *Vaughan*, 88 Va. 832, 14 S. E. 754, that the original writ so returned sufficed to keep pending the action commenced thereby, without any *hiatus*, until the return thereon was quashed by the court, and that the second writ having issued prior to the quashing of the return on the original writ, and having been duly served and returned, there was no *hiatus* in the action which could operate as a discontinuance thereof.

The case of *Va. Fire & Marine Ins. Co.* v. *Vaughan, supra,* has been of such long standing in its holding, undisturbed prior to the Code of 1919, that it has established a rule of practice which has been doubtless followed by the bar of the State prior to such Code. Hence, we feel that we should not hold ineffective action which has been taken in accordance with that rule of procedure.

In the case just mentioned the action was on a fire insurance policy, which stipulated that it must be commenced "within six months next succeeding the date of the fire or damage." The original writ of summons was issued within that period and was made returnable to rules. It was returned "executed" on an agent of the defendant company on a certain date, but that date was less than ten days before the return day. Therefore, the service was bad, not

being in conformity with the statute in such case made and provided. Code, section 3227. Accordingly, the defendant moved the court at a subsequent term to quash the writ and return and to dismiss the case from the docket. The circuit court overruled the motion and remanded the cause to rules "to be properly matured." An alias writ of summons was afterwards accordingly issued, which was duly served and returned. In the opinion of this court, delivered by Judge Lewis, this is said:

"1. There is no error in the order of the circuit court remanding the case to rules to be properly matured. The defect was not in the writ itself, but in the service and return, and that was no ground for quashing the writ. The recent case of *R. & D. R. Co.* v. *Rudd,* 88 Va. p. 648, 14 S. E. 361, is a sufficient authority upon this point.

"2. This also disposes of the question whether the action was commenced within the time stipulated for in the policy; that is, 'within six months next succeeding the date of the fire or damage.' The commencement of the action was the issuance, not of the *alias,* but of the original summons, and that was within the stipulated period."

From what is said on the first point dealt with in the case just cited, it will also be seen that the court draws a proper distinction between cases where the original writ is valid, but the service is invalid, as is true of the original writ in the case before us; and cases where the original writ itself is void, as was true in the case of *Noell* v. *Noell,* 93 Va. 433, 25 S. E. 242, cited in the reply brief for the company.

[3] As will be observed, the holding of this court in the case just cited is to the effect that the original process returned "executed" as aforesaid, although in a manner which rendered the service invalid, sufficed to authorize the placing of the case on the docket and to keep the action pending from the date of the issuing of the writ until the circuit court acted upon the motion to quash the return; and that

the action of the circuit court in remanding the case to rules to be properly matured kept the action still further pending until the second process was accordingly subsequently issued, duly served and returned, thus preventing any *hiatus* which could operate as a discontinuance of the action; so that the latter process was held to be an alias and not an original writ. Following such holding we conclude that the second writ in the case before us must be regarded as an alias and not as an original writ commencing the action, and that the action in the case before us was commenced by the original writ, and suffered no discontinuance prior to the issuing of the second writ.

[4] Such being our conclusion, based upon the construction which this court has heretofore given to the Virginia Statute as applicable to facts which are substantially the same as in the case now before us, it would be of no profit for us to consider the question now before us on principle and in its broader aspects as applicable to other process, or to further deal with the authorities cited and relied on by the company on such question. We have been the more disposed to this course because of the fact that under the statute as amended by the Code of 1919 (section 6059) it is made the *ex officio* duty of the clerk, unless otherwise directed by the plaintiff or his attorney, to issue alias and pluries process in all cases at the return day of the next preceding process if the latter be not on that day returned executed, thus fixing expressly the time at which all alias and pluries processes must be issued in all cases which have arisen since the new Code went into effect, and which may arise in future.

[5] 2. Did the instruction of the mine foreman to the brakemen on the cars operated on the main haulway, with carbide lights in their caps, to ride on the front end of each trip of cars, "provide * * * for the carrying of a conspicuous light on the front * * * of every trip or train

of cars when in motion   *   *   *   ," which is required by the statute (4 Pollard's Code, p. 833).

We are of opinion that this question must be answered in the negative.

[6] Aside from the question of the sufficiency of the light, which we do not here pass upon, such an instruction as that given to the brakeman in the case before us is not a provision for the carrying of a light on the front of the trips or trains of cars at all. It would serve to provide a light in such place only if the brakeman should chance to be in such a position as he rides on the front end of each trip of cars that the light on his cap would shine ahead; and it would provide that light only so long as the brakeman might not be called away from his position by some occurrence which calls for attention elsewhere. It is manifest that it is likely to often happen that there may be some derailment or other occurrence which may imperatively call the brakeman from the position on the front of the trip or train of cars for a time and the cars may be in motion at the time or before he can regain that position. Such an occurrence, indeed, happened in the instant case. There had been a wreck about 100 to 150 yards down on the main haulway track. At that place the brakeman on the main line train was occupied in "putting some wrecks on," which took him away from the end of the train; and when he got aboard the train he got on "about the second or third car from the head end," and he was going across the cars when they were in motion, towards the head end, with his light invisible ahead, to the plaintiff, either preceding or when the accident occurred. To be a provision such as is required by the statute, it should be a provision for a light affixed or hung on the front of the trip or train of cars itself, in such a manner that it will shine ahead.

[7] 3. Did the court below err in giving the following instruction at the instance of the plaintiff?

## INSTRUCTION NO. 2.

"The court instructs the jury that if they believe from the evidence that the defendant company was running the train of empty mine cars through the main entry with the trip motor at the time the plaintiff, William M. Bates, was injured, without providing a proper system of signals therefor, or without having a conspicious light on the front end of said train, then the defendant was guilty of negligence, and the plaintiff is entitled to recover, provided the said negligence was the proximate cause of the plaintiff's injury, and the defendant was not guilty of contributory negligence; and, if the defendant relies upon contributory negligence as a defense, the burden is upon the defendant to prove by a preponderance of the evidence that the plaintiff was guilty of contributory negligence."

The question just stated must be answered in the negative.

The objection urged against this instruction by the company is that the statute says that it shall be the duty of the mine foreman to *provide* for the carrying of the light on the front end of the train. The instruction tells the jury that the defendant was liable if the light was not there. The difference between the instruction and the statute is the difference between the absolute duty of having the light there and the duty of providing for its being there.

Abstractly, the objection is well taken. The instruction should have contained the qualifying word "provide," which is in the statute, in connection with the language on the subject of the light, so as to have read "without providing for a conspicuous light," etc. But such error was immaterial and harmless in the instant case, since there is no evidence that the company provided for a light on the front end of the train in the sense which we have above held the statute requires.

[8] 4.   Did the plaintiff, by continuing his work in the mine, after knowledge of the breach by the company of its statutory duty aforesaid of providing for the carrying of a conspicuous light on the front of every trip or train of cars on the main haulway, assume the risk of injury from such breach of duty by the master?

We are of opinion that this question also must be answered in the negative.

This question was heretofore an open one in this court. it was left undecided in *Virginia Iron, Coal and Coke Co.* v. *Asbury's Adm'r,* 117 Va. 683, 86 S. E. 148.   There is a conflict of authority on the subject elsewhere.   See *Narramore* v. *Cleveland, etc., Ry. Co.,* 96 Fed. 298, 37 C. C. A. 499, 48 L. R. A. 268; *Denver, etc., Ry. Co.* v. *Norgate,* 141 Fed. 247, 72 C. C. A. 365, 6 L. R. A. (N. S.) 981, 5 Ann. Cas. 448; *Knisely* v. *Pratt,* 148 N. Y. 372, 42 N. E. 986, 32 L. R. A. 367.   The same statute and the precise question which we have under consideration was before the United States Circuit Court of Appeals in the case of *Pocahontas Consolidated Collieries Co.* v. *Johnson,* 244 Fed. 368, 156 C. C. A. 654.

In that case Judge Knapp delivered an able and forceful dissenting opinion; but the majority opinion, delivered by Judge Woods, equally able and more convincing to our minds, held that the doctrine of assumption of risk does not apply to the breach of such a statutory duty as that in question.   We think that is the sound and correct conclusion, both on principle and upon authority.   See the case last mentioned and the authorities therein cited.

[9] When we consider the subject on principle, we see that if the conclusion just stated be not correct, the statute may be nullified and set at naught merely by the flagrant and systematic violation of it.   It cannot be doubted that the common law doctrine of the assumption of risk may be abolished by statute with respect to any duty of the master.

Now by necessary implication, as we think, that precisely is the effect of the statute in question in its application to the statutory duty under consideration. And, to say that the statute may be nullified by the systematic violation of it, is to hold that the common law doctrine aforesaid cannot be abolished by statute, which would be a contradiction in terms.

[10] 5. Did the court below err in refusing to give either of two instructions, Nos. 7 and 8, asked for by the company, which were the same in substance and would have instructed the jury that if they should "believe from the evidence that it was the duty of the plaintiff to use reasonable care to protect himself from the main heading motor, flagging or listening for the same, while he was on the main entry with his gathering motor, and that the plaintiff failed to use reasonable care to protect himself from said main heading motor, and that such failure on the part of the plaintiff contributed to the injury complained of, then you are instructed that the plaintiff was guilty of contributory negligence and cannot recover?"

This question must be answered in the negative.

The court had already given three instructions at the instance of the plaintiff, Nos. 1, 2 and 3, and four instructions at the instance of the company, Nos. 1, 2, 3 and 5, in which the question of contributory negligence was submitted to the jury.

Instruction No. 1, given at the request of the company, was as follows: "The court instructs the jury that the defendant company was not the grantor of the safety of the plaintiff, and that the plaintiff was under as great obligation to provide for his own safety from such dangers as were known to him, or were discernible to a person of his age and capacity by the exercise of ordinary care on his part, as the defendant was to provide for him, and if the jury believe from the evidence that the plaintiff might have

saved himself from injury by the exercise of such ordinary care on his part, they must find for the defendant."

We are of opinion that the jury were sufficiently instructed on the subject of contributory negligence, and that the giving of instructions 7 or 8, asked for by the company, would have been a needless multiplication of instructions on that subject.

[11] 6. Did the court err in allowing the plaintiff to again testify on the subject of the speed of the motor he was operating, as set forth in the statement preceding this opinion?

We think his testimony was plainly admissible under the rules applicable to rebuttal evidence. If a witness, under such circumstances, makes a change in his testimony, his credibility is for the jury.

There are some other questions raised by the assignments of error, but as they are not in any way novel, it is deemed sufficient to say of them that we have carefully considered all of them and find no merit in any of them.

The judgment under review will be affirmed.

*Affirmed.*