# 𝕽𝖎𝖈𝖍𝖒𝖔𝖓𝖉

## QUEEN INSURANCE COMPANY OF AMERICA V. PERKINSON.

### January 20, 1921.

1. APPEAL AND ERROR.—*Objection to Instruction for the First Time on Appeal.*—A party objecting to an erroneous instruction must do so at the time it is given; otherwise, in general, the party will be considered as having waived the objection.

2. APPEAL AND ERROR.—*New Trial—Instructions—Conflict Between Verdict and an Erroneous Instruction.*—Where the verdict is right, it will not be set aside because it is in conflict with an erroneous ruling of the court.

3. APPEAL AND ERROR.—*Case Must be Stated as Jury May Have Viewed it.*—Formerly a plaintiff in error stood in the Supreme Court of Appeals in the position of a demurrant to the evidence, but this has been changed. Code of 1919, sec. 6365. Now, in stating a case in that court which has been tried by a jury, it must be stated as the jury may have viewed it, remembering always that the jury are the sole judges of the weight to be given to the testimony of the witnesses, and also bearing in mind the weight attached to the verdict of a jury which has received the approval of the trial judge.

4. FIRE INSURANCE.—*Loss Caused by Order of any Civil Authority—Case at Bar.*—In the instant case, an action to recover on an insurance policy for loss from fire, defendant claimed that the loss was caused by order of civil authority, which was excepted by the policy. The trial court had instructed that if the fire was set to the building by order of the mayor it was by order of civil authority, and as defendant had not objected to this instruction it was the law of the case.

   *Held:* That under the evidence, it was clear that the fire was set by policemen in consequence and as a result of an order of the mayor, and accordingly the verdict for plaintiff was without evidence to support it, and was contrary to the law laid down in the instructions, and must be set aside.

5. APPEAL AND ERROR.—*Judgment of Appellate Court—Remand—Case at Bar.*—The law of the case as fixed by the instructions of the trial court, to which there was no exceptions, being with the defendant, and the verdict for the plaintiff being without evidence to support it, the Supreme Court of Appeals, in pur-

suance of section 6365 of the Code of 1919, will enter such judgment as is warranted by the undisputed facts of the case. The case could not be remanded to enable the plaintiff to change her position with reference to the law.

Error to a judgment of the Circuit Court of the city of Danville in an action of assumpsit. Judgment for plaintiff. Defendant assigns error.

*Reversed.*

The opinion states the case.

*King & Spalding* and *Eugene Withers,* for the plaintiff in error.

*Harris & Harvey,* for the defendant in error.

BURKS, J., delivered the opinion of the court.

This is an action on a fire insurance policy to recover for damage done by fire to a dwelling house in the city of Danville. The policy was the "standard policy," and provided, amongst other things, that the company should not be liable for loss caused directly or indirectly by riot, or by order of any civil authority, "or (unless fire ensues, and in that event, for damages by fire only) by explosion of any kind." The company pleaded the general issue, and also, by special pleas and by statement in writing of its grounds of defense, set up the further defenses, that the loss was caused by riot, that it was caused by order of civil authority, and that it was caused by explosion from which the fire did not ensue. Issue was taken on these pleas, and there was a verdict and judgment for the plaintiff for $1,000, and of this the insurance company complains.

The circumstances under which the fire occurred were as follows: On October 12, 1917, Walter Clark, a negro, who was being sought by the police for some offense he was alleged to have committed, took refuge in the house which he

had rented and which was his home. It is manifest that he intended to resist to the last. When policemen went to the house to arrest him, he fired from within the house, killing policeman McCray, seriously wounding deputy sergeant Boisseau, and slightly wounding policeman Lewis. The news of the shooting spread rapidly throughout the city, and the house was soon surrounded by policemen, firemen and an ever increasing crowd of citizens, many of whom were armed. Efforts were then made to obtain access to Clark, but without avail. Pending these efforts Clark again fired from his place of concealment, this time wounding two policemen and a citizen. An attempt was then made to dynamite the house, and at least three sticks of dynamite were successively, or at different time, thrown into the house, two of which exploded doing considerable damage, but failed of their purpose to either kill Clark or run him out of the building. No fire ensued from the dynamiting. In the meantime the crowd outside the building had greatly increased and was ever increasing. The chief of the fire department had hose attached to a fire plug and "water in the hose." Some half-hour after the dynamiting, the chief of the fire department enquired for the mayor, saying, "I want to fire the building to get this negro out of here." To which the Commonwealth's attorney replied, "Go ahead and fire it; I will see the mayor." The chief then attempted to fire the house, but failed in his efforts. The Commonwealth's attorney testified that orders were given to fire the building, first by himself, and afterwards by the mayor; that he was present when the building was fired, and that it was fired by Sergeant Martin and Mr. Tucker of the police force. When the building was thoroughly afire and burning fiercely, Clark appeared at the door, with his head afire and a gun in his hand. He was met by a volley of five hundred or a thousand shots, so many that the witnesses say that his body was momentarily

suspended in the air by the force of the missiles, and he was instantly killed and fell to the ground. An officer pulled the body from the edge of the burning building, when several persons grabbed it by the legs and dragged it down the street, followed by a crowd estimated at five hundred. When near the courthouse, Policeman Tucker got the body and stood upon it to keep the crowd back, and pretty soon other policemen arrived and formed a circle around it in order to prevent its mutilation or removal. One witness, a police sergeant, says they "wanted to shoot him and cut him up and one thing and another." The chief of police testified "they were liable to tear the body to pieces, something like that." A colored undertaker to whom the body was to be delivered was set upon and vigorously assaulted, but was rescued without serious injury. Under persuasion of the police and the mayor, the crowd in a short while dispersed without further disturbance. It clearly appears that great excitement prevailed, that many of the crowd were armed, and a great many shots were fired by the crowd into the building before it was fired.

When Police Sergeant Martin was questioned as to the conduct of the crowd, he said: "All that I saw up until the body had fallen out of the door was quiet, peaceful and orderly and part of them curious, sitting up in trees, and some of them up on the house and up on the fence.

"Q. Just watching the proceedings?

"A. Just looking on and lots of them had rifles and shotguns and pistols, sitting up there to keep him from doing any other damage, and if they could see him they were going to kill him.

"Q. The object was to assist in arresting or obtaining this man?

"A. In the right and proper way as far as I could see. I didn't see anyone doing anything wrong."

When the Commonwealth's attorney was asked whether

or not there was a riot at that place, he replied: "That is a question of opinion. I can't answer it directly. I can give you my idea of what was taking place." He then proceeded to state the facts, from which we make the following extract, as to the situation up to the time Clark was shot and fell out of the door:

"Lots of citizens were there armed with revolvers, rifles and shot-guns. One of them gave me a pistol. I never used it and never was anywhere that I could fire to any advantage and never used it. They were bent on getting this man. My first thought was whether there was any possibility of getting him alive and away from the crowd. I soon came to the conclusion that that was impossible for the reason that the temper of the crowd, I didn't believe, would admit of it, and for another reason that the conduct of the negro himself indicated that he intended to die fighting. There didn't seem to be any difference then in the object of either the police or the crowd. I think they were both satisfied that the negro must be killed and the crowd and the police were working in absolute harmony. I saw no disposition to override the authorities or to contest them until after Clark came from the house and when he walked out he was shot and momentarily his body held in the air by this continued firing."

A number of errors are assigned in the petition, some of which would have to be sustained, thereby resulting in a reversal, but they pale into insignificance beside the only assignments which we deem it necessary to consider.

On the trial, the circuit court (besides other instructions) gave two instructions, one for the plaintiff and the other for the defendant, as follows:

*Instruction for the Plaintiff.*—"The court instructs the jury that even if they should believe from the evidence that the mayor ordered the building set on fire, that if they further believe that the fire was started by Officers Martin

and Tucker, not acting under any such order and without knowledge of same, and said order did not directly or indirectly cause the fire, then they must find for Mrs. Perkinson. And the burden of proof to show that said fire was caused directly or indirectly by the order of the mayor is upon the insurance company."

*Instruction for the Defendant.*—"The court further instructs the jury that under the terms of the policy sued on in this case the defendant company is not liable for loss or damage by fire caused by order of any civil authority, and if they believe from the evidence that the building insured under the policy sued on was set on fire by John R. Tucker, a policeman of said city of Danville, with the aid and assistance of other policemen and citizens, and that said Tucker and said other policemen and citizens in so setting said building on fire were acting under the authority of Harry Wooding, mayor of said city, and that as a result of said act of said Tucker and such other policemen and citizens said building was partially burned, and the loss or damage to said building for which this action is brought was occasioned thereby, that the fire so set out as aforesaid was by order of civil authority, and the defendant is not liable for the damage caused thereby."

[1, 2] The plaintiff made no objection to the latter instruction. These instructions plainly told the jury that the order of the mayor to burn the building was an "order of any civil authority" within the meaning of the policy, and left to the jury the determination of the question of whether or not the burning was done in pursuance of the order. The jury found for the plaintiff. If this finding was without evidence to support it, or was plainly contrary to the evidence, then the verdict was contrary to the law as laid down in the instructions and to the evidence. But, *if the law was incorrectly stated* in the instruction, what is to be the effect thereof? The plaintiff below made no objection

thereto in the trial court, took no exception to the action of the court in giving the instruction for the defendant, invited the alleged error by the instruction which was given at her instance, and does not and could not assign as cross-error in this court the action of the trial court in giving said instructions.    The result is that, so far as this case is concerned, the order of the mayor was the "order of any civil authority" within the meaning of the policy.    The verdict for the plaintiff does not controvert this, but is a finding that the firing was not done in pursuance, or in consequence, of the order of the mayor.    Had the verdict, under these instructions, been for the defendant, "great difficulty might arise in interfering with it," even if we were of opinion that the order of the mayor was the order of any civil authority, "because a party objecting to an erroneous instruction must do so at the time; otherwise, in general, he will be considered as having waived the objection.    But where the verdict is right, it will not be set aside because it is in conflict with an erroneous ruling of the court." *Richmond & D. R. Co.* v. *Medley,* 75 Va. 499, 503 (40 Am. Rep. 734) ; *Collins* v. *George,* 102 Va. 508, 518, 46 S. E. 684.    See also, *Holdsworth* v. *Crowder,* 111 Va. 663, 69 S. E. 935.    We must enquire, therefore, was the verdict right? Is there evidence in the record sufficient to sustain the finding that, in setting fire to the building, Policeman Tucker and those assisting him were not acting under the orders of the mayor?

[3]    In *P. Lorillard Co.* v. *Clay,* 127 Va. 734, 104 S. E. 384, it is said: "Formerly a plaintiff in error stood in this court in the position of a demurrant to the evidence, but this has been changed.    Now, in stating a case in this court which has been tried by a jury, it must be stated as the jury may have viewed it, remembering always that the jury are the sole judges of the weight to be given to the testimony of the witnesses, and also bearing in mind the

weight attached to the verdict of a jury which has received the approval of the trial judge. Code, sec. 6365; *Roach* v. *Southern Ry. Co.*, 114 Va. 440, 76 S. E. 953, and cases cited."

There was no conflict in the testimony on the subject of the setting out of the fire, and just what took place will be best understood by stating the facts in their chronological order. A crowd had gathered about the building, numerous shots had been fired into it with the hope of striking Clark therein, and the building had been dynamited two or three times, but all to no effect. In the meantime, Clark had shot from his place of concealment and wounded three of those who were seeking his arrest. About half an hour after the dynamiting and when all other efforts to dislodge Clark had failed, the fire chief of the city came up to Carter, the attorney for the Commonwealth for the city, who was in the crowd, and after telling him of the futile efforts that had been made, asked "whether the house ought to be fired," and the reply was: "I told him it ought and to go ahead at once. He wanted to know about the mayor, and I told him I would find the mayor, or have some one find him and I was sure the mayor would agree." Thereupon the fire chief, without seeing the mayor or having any orders from him, "went ahead and attempted to fire the house," but "failed to set it afire." In the meantime, Carter, the attorney for the Commonwealth, went around to the back of the building, where he was told by some officer who had seen the mayor that the mayor had not given him permission to set fire to the house. He testified that while standing in the back yard, "some of the officers and some of the citizens came up to me very much excited and gesticulating with pistols in my face this way (indicating), and asked me why they couldn't set fire to the house. I replied that I thought it ought to be done, but that the mayor didn't agree. I didn't see the mayor then. The mayor was

right at my back, and when I made that statement he said, 'No, I told them about ten minutes ago to go ahead and fire the house.' When he said that, this crowd that had come there for that purpose—I don't mean a big crowd but two or three people, and I think Mr. Martin was one of them, turned away and went off, and in a few minutes the gasoline was brought there and the house was fired."

Apparently every one was waiting for the command, or at least the assent of the mayor, and it does not appear that any effort was made to fire the building until after this command or assent was given or assured, and that the building was fired "in a few minutes" after the order was given. The fire was actually set by Policeman Tucker, with the assistance of Policeman Martin and a stranger. Carter, the attorney for the Commonwealth, whose testimony we have just quoted, was also present. The testimony of Martin and of Tucker, so far as relevant, is given in their own language:

Martin testified as follows:

"Q. You have testified, Mr. Martin, that you and Mr. Tucker set the building on fire which, to the best of your knowledge, was the first fire in the building. Will you please state, Mr. Martin, whether in setting it on fire you were acting under any official authority or instructions which you had gotten from any officials?

"A. No, nobody hadn't given me no orders, but somebody was saying, 'Set it afire,' but who they were and who said 'Set it afire' I don't know, but we set it.

"Q. But you weren't acting under any authority given you by anybody?

"A. No, sir, I went in there and Mr. Tucker went in this room breaking up kindling, fixing to set it afire and I lit in and helped him."

When asked if anybody else was helping him and Tucker to set the building on fire, he replied, "Chief Brooks, chief

of the fire department, was there and Mr. Bill Edwards who was a police officer at the time, and Mr. Luther Fair was around there, and Judge Peatross was right there in the yard looking in at the door at the time we was setting the fire."

On cross-examination he testified as follows:

"Q. You had heard them say around there to set it on fire.

"A. Somebody said 'Set it afire,' but I had no orders from the mayor or the judge.

"Q. You mean by that that the mayor did not come to you and say to you, 'Go and set that house on fire'?

"A. No.

"Q. And the Commonwealth's attorney hadn't said that or the judge, but you heard that said, 'Set the house afire,' and you went in and saw Tucker at work setting it afire?

"A. I had heard that all along but I paid no attention to it, and finally I walked in there and set it afire.

"By the Court:

"Q. Did you see Mr. John Carter there before the house was set on fire?

"A. Yes, sir.

"By Mr. Harris:

"Q. Did you hear him say anything about setting it on fire?

"A. I never heard him say anything about it at all."

Tucker testified as follows:

"Q. Did you hear Sergeant Martin's testimony this morning as to the fire being set out by you and Sergeant Martin?

"A. Yes, sir.

"Q. Did you and Sergeant Martin set out the fire together there?

"A. Yes, sir, together with another party, a carnival fellow. I never did get his name.

29

"Q. Mr. Tucker, will you please state whether in setting out that fire you were acting under any authority or orders from the mayor or Commonwealth's attorney for Danville?

"A. I don't know where it came from.

"Q. Did you get it from any one of those?

"A. I did not * * * when they said 'fire the house' I wanted to fire it about an hour before we did, so the news came from somebody; who it came from I don't know * * *.

"Q. At the time you set that fire out and at the time you went to the rear part of this building and set another fire out you knew that somebody had given orders to fire it, didn't you, or so understood?

"A. I thought they had because I had asked Judge Peatross an hour before that to let us fire.

"Q. You were under the impression when you set that fire out that orders had been given to fire the building?

"A. Yes, sir, by some one. I didn't take time—

"By the Court:

"Q. What did you say?

"A. I said I thought by some one but I didn't know who and I didn't leave the front to go and find out who ordered it because the fire hose was pulled up at that time and was right in front of the place and a stream of water was already in it."

*    *    *    *    *    *    *    *    *

"By the Court:

"Q. What did you say about having any information about setting fire to that house?

"A. At the time I spoke of it?

"Q. What did you say about having an order from the civil authorities to do it at that time?

"A. I didn't know who the orders came from.

"Q. Did you know at that time that an order had been issued?

"A. Yes, sir, I had heard and a fellow called me and said that they said to fire the house and that is when I went in. I don't know who the orders came from, but anyhow this can of gasoline was sent up there."

An examination of this testimony shows that Martin was not acting on his own initiative, but that he just "lit in and helped" Tucker, and if Tucker was authorized so was he. His cross-examination also shows that when he said that he was not authorized by the mayor, he meant that the mayor did not come to him and say: "Go and set that house afire." An examination of the testimony of Tucker shows that he "wanted to fire it about an hour before we did," but he refrained from doing so until he received orders to do it, and that he received such orders. It is true he testified that he did not know at the time from whom the order emanated nor by whom it was communicated, but he did know that he received an order, and when he received it "that is when I went in." The uncontradicted evidence is that the order was given by the mayor, and that "in a few minutes the gasoline was brought there and the house was fired" by Tucker and his assistants, after being informed by some one that the order to fire had been issued. About the time Tucker was firing the house, a man named "Griffin drove the oil wagon up," and "set down a five gallon can of gasoline," saying "here is some gasoline." Tucker took the gasoline, threw it into the burning building and it was speedily burned.

The following facts appear from the record, and are not disputed: The fire was set by Policeman Tucker assisted by Policeman Martin, who simply "lit in and helped him." An hour before, he had endeavored to get authority to set the fire, but could not. Several policemen and others, very much excited and gesticulating with pistols in the face of the attorney for the Commonwealth of the city, demanded to know why they could not set fire to the house, when the

mayor who was present said: "I told them about ten min-
utes ago to go ahead and fire the house." The parties then
turned and went back. Tucker knew that an order had been
issued to fire the building, and some one called out to him
and said that "they said to fire the house," and at that time
he went in and fired it. In the mean time a five gallon can
of gasoline was brought by the oil wagon and was used to
set the fire. All of this occurred within a few minutes af-
ter the mayor stated that he had given the order to fire the
house.

[4, 5] Upon this state of facts, it is clear that the fire
was set by the policeman in consequence and as a result
of the order of the mayor.

The verdict of the jury, therefore, so far as it holds to
the contrary was plainly without evidence to support it,
and was contrary to the law laid down in the instructions,
and the trial court should have set it aside for that reason
and entered final judgment for the defendant in accordance
with section 6251 of the Code. Had this been done, we
should have been compelled simply to have affirmed the
judgment.

The very interesting question of whether the order of
the mayor was the "order of any civil authority," so ably
argued by counsel on both sides, must be left undecided.
So far as it affects this case, the law on that subject was
fixed by the instruction of the trial court given at the in-
stance of the defendant, to which the plaintiff did not ob-
ject then, and to which she cannot object now. The law
of the case as thus ascertained being with the defendant,
and the evidence showing that the fire set by the policeman
was so set in pursuance of the order of the mayor, this
court, in pursuance of section 6365 of the Code, must enter
such judgment as is warranted by the undisputed facts of
the case. Assuming the law as fixed, there are sufficient
facts before this court to enable it to attain the ends of

justice. The case cannot be remanded to enable the plaintiff to change her position with reference to the law. The judgment of the trial court will be reversed, the verdict of the jury set aside, and judgment entered in this court that the plaintiff's action be dismissed, with costs to the defendant in this court and also in the trial court.

*Reversed.*

SIMS, J., dissenting:

As I understand the testimony in this case, it shows clearly that the two police officers of the city of Danville, who set the fire in question, did this for the purpose of capturing, dead or alive, the fugitive from justice, who was resisting arrest, had just a few minutes before killed one of the officers attempting his arrest and seriously wounded others, and was even then firing at every opportunity with murderous intent upon all who approached him; that they would have set the fire as they did if there had been no assembly of people whatsoever, but only the other officers outside of the building; that this action in setting the fire was not actuated by or in concert with the intent or action of such assembly of people, but wholly independent thereof; that these two acted on their own personal initiative as officers, or at least not under or because of any order or direction of the mayor, or other civil authority; that the evidence shows that it cannot be claimed by the insurance company that any order to set the fire came from any other than two sources, namely, from the Commonwealth's attorney, as speaking for the mayor and from the mayor. The weight of the evidence is overwhelming in exclusion of the hypothesis that the order of the Commonwealth's attorney caused the fire to be set out. And as to the order of the mayor, if he gave any order or direction for firing the building he did not give it to the officers who set the fire; and it was not communicated to them as

coming from the mayor, as they expressly testify.  Hence, as I think, the jury were warranted in finding, as they did in effect by their verdict, that the conduct of these two officers in setting the fire was not influenced in any way by such order or direction as coming from the mayor.  Therefore, as I think, so far as this case is concerned, it must be considered as if no such order or direction was ever given.

The clause in the policy on which the insurance company relies to release it from liability in this case, so far as material, is as follows:

"This company shall not be liable for loss caused directly or indirectly by * * riot * * or by order of any civil authority."

The riot referred to is the common law offense of riot. To say the least on the subject, it is a matter of much doubt whether the action of the assembly of the people aforesaid constituted a riot.  See 1 Bishop's New Cr. Law (8th ed.), sec. 534; 2 *Idem*, sec. 1143; note to 94 Am. Dec. 136-7.

As said in 1 Bishop's New Cr. Law, *supra,* giving Blackstone's definition of the offense: "An unlawful assembly is the congregation of three or more persons to do some unlawful act; 'as, to pull down enclosures, to destroy a warren, or the game therein;' they parting 'without doing it, or making any motion towards it.'  If, instead of their separating without action, they accomplished some object to the terror of the people, their offense becomes a riot."

As said in 2 Bish. New Cr. Law, *supra:* "Riot is such disorderly conduct in three or more persons, actually accomplishing an object, as is calculated to terrify others," —citing Hawkins, P. C., Coke's Inst., and other authorities.

From the authorities on the subject there seem to be two features which are essential to constitute a riot: (1) Either that the assembly of three or more persons must be for an unlawful purpose, or (2) that the action of the assembly

must be in a manner which is so disorderly as to be calculated to terrify others—the terror arising from the disorder of the conduct. Neither of these features characterized the assembly of the people involved in the instant case. They assembled for a lawful purpose, namely, to capture the fugitive from justice, dead or alive. They acted when assembled in an orderly and not in a disorderly manner and their manner of action did not in fact, nor was it calculated to, terrify others.

*A fortiori* the conduct of the two police officers aforesaid did not constitute a riot.

If the insurance company wished to exclude its liability in a case such as that before us of a fire set out by ministerial officers in order to effect the capture of a fugitive from justice, suitable language to cover such an exception from liability should have been used in the policy of insurance. While the courts will give a fair and reasonable construction to insurance contracts, as to other contracts, still, as is well settled, the form of insurance contracts being chosen by the insurance companies themselves, they are to be strongly construed against them where the meaning of the language is in any doubt; and, as these companies do the business for compensation, the meaning of words relied on to exempt them from liability, after they have collected the compensation, should be plainly to that effect before the courts should give that effect to the words of the contract. And I do not think that it is plain that the words of the exception clause of the policy aforesaid with reference to "loss caused directly or indirectly by * * riot," cover the case of a fire set out as was the fire in the instant case.

In the cases of *Lycoming Ins. Co.* v. *Schwenk*, 95 Pa. 89, 40 Am. Rep. 629; *Luckett, etc., Tobacco Co.* v. *Globe Ins. Co.* (C. C.), 171 Fed. 147, and *Blakeman* v. *Wichita*, 93 Kan. 444, 144 Pac. 816, L. R. A. 1915C, 578, Anno. Cas. 1916D,

188, cited and relied on for the insurance company, the action of the assembly of people was unquestionably unlawful at common law. In *State* v. *Brown,* 69 Ind. 95, 35 Am. Rep. 210, and cited and relied on for the insurance company, the action of the assembly of people was in violation of a statute.

As to the fire being set out "by order of any civil authority." Instruction No. 6 given for the defendant submitted that question of fact to the jury in so far as any order of the mayor is concerned. Not being excepted to, that instruction is the law of the case, even if erroneous. *R. & D. R. Co.* v. *Medley,* 75 Va. 499. The jury by their verdict, in accordance with this instruction and not in opposition to it, found against the insurance company on this issue of fact. As aforesaid, the evidence, as I think, was clearly in accord with this finding, so that the verdict should not be disturbed. However, had the verdict in such case been in opposition to the instruction, under the doctrine of the *Medley Case* just cited, it should not be disturbed.