# Staunton.

## JAMES C. DAVIS, DIRECTOR GENERAL OF RAILROADS, v. LENA D. McCALL.

### September 29, 1922.

1. DISMISSAL, DISCONTINUANCE AND NONSUIT—*Quashing Process—Remanding to Rules with Directions for Issuance of Alias Process—Parties—Director General of Railroads—"Agent Designated by the President."*—Upon a motion to quash process and dismiss the action on the ground that the process was against the Director General of Railroads and not against the "agent designated by the President," upon quashing the original writ, the trial court should have dismissed the action. It did not formally do this, but did so in effect by remanding the case to rules for issuance of an *alias* process.

2. DISMISSAL, DISCONTINUANCE AND NONSUIT—*Quashing Writ—Plaintiff Bringing New Action Instead of Having Alias Process Issued.*—Where the trial court sustained a motion to quash the original writ and remanded the case to rules for issuance of an *alias* process, the plaintiff's claim not being barred by the statute of limitations, she had a perfect right to institute a new action by the issuance of a new original writ instead of proceeding by an *alias* writ in the old action. The fact that an *alias* writ was directed in the old action did not affect the right of the plaintiff to sue out an original writ in the new. The plaintiff had the right to ignore the old action and treat it as dismissed and institute a new action.

3. SUMMONS AND PROCESS—*Action Instituted When Court in Session—Code of 1919, Section 6074.*—Plaintiffs have always had the right to institute actions at any time, whether during the session or in vacation of the court, and under section 6074 of the Code rules are required to be held at the time required by law, whether the court is in session or not.

4. DISMISSAL, DISCONTINUANCE AND NONSUIT—*Plaintiff Bringing New Action—Declaration in Old Action Treated as Declaration in New Action—Case at Bar.*—The trial court quashed the original process in an action by plaintiff against defendant on the ground that the process was against the Director General of Railroads, and not against the agent designated by the President, and remanded the case to rules for issuance of an *alias* process. Plaintiff sued out an original writ beginning a new action and not an *alias* writ. Plaintiff

and the clerk treated the amended declaration in the old action as the declaration in the new action, the clerk took rules thereon, and the case was regularly matured for hearing.

*Held:* There was no error in the proceeding.

5. SUMMONS AND PROCESS—*Whether Payment of Writ Tax a Condition Precedent.*—Where process in a former action was quashed and plaintiff instituted a new action, the fact that the writ tax had not been paid on the new action was not a matter which the defendant could set up in bar of the action. The payment of the tax was a matter between the clerk and the Commonwealth, and the payment of the tax before the writ was issued was not such a necessary condition precedent to the issuing of the writ as to entitle the defendant to set up the failure to pay it in bar of the action.

6. SUMMONS AND PROCESS—*Alias or Original Writ.*—The mere fact that a writ is designated as an *alias* writ or as an original "cannot possibly affect or change its essential character or render it less effectual as a process for bringing the defendant before the court."

7. APPEAL AND ERROR—*Rule of Decision in Appellate Court—Code of 1919, Section 6363—Judgment in Support of Verdict.*—Code of 1919, section 6363, providing that "the judgment of the trial court shall not be set aside unless it appears from the evidence that such judgment is plainly wrong or without evidence to support it" must be read in connection with section 6251 of the Code of 1919 and the explanatory note thereto by the revisors. When so read, it is fairly plain that the judgment referred to in section 6363 is a judgment in support of the verdict.

8. APPEAL AND ERROR—*Rule of Decision in Appellate Court—Code of 1919, Section 6363.*—Section 6363 of the Code of 1919 providing that "the judgment of the trial court shall not be set aside unless it appears from the evidence that such judgment is plainly wrong or without evidence to support it" wrought but slight change in the law as it formerly stood that the case would be regarded by the appellate court as on a demurrer to the evidence. It was intended to meet exceptional cases where the verdict and judgment were plainly wrong and injustice was done because there was some evidence in favor of the verdict and judgment, though entitled to little weight, but the judgment could not be disturbed on account of the strict, and sometimes technical, enforcement of the rule "as on a demurrer to the evidence." In a great majority of instances, cases at law arising under section 6363 of the Code are still to be heard in the Supreme Court of Appeals practically as on a demurrer to the evidence by the plaintiff in error, but exceptional cases may arise where a strict and technical enforcement of that rule would work injustice, and in those cases some latitude is allowed to the Supreme Court of Appeals.

9. NEW TRIALS—*Power of Courts Over Verdict—Code of 1919.*—Trial courts have no greater power over verdicts now than they had before the enactment of the Code of 1919 (see section 6252), nor has the

Supreme Court of Appeals. The Supreme Court of Appeals has always exercised the power and duty, when not hampered by statute, of setting aside a judgment that was plainly wrong or without evidence to support it.

10. CROSSINGS—*Warning—Common Law Duty—Appeal and Error—Conflicting Evidence—Case at Bar.*—In the instant case, an action for damages for injuries sustained in an accident at a railroad crossing, as the crossing was in an incorporated town there was no statute requiring warning of an approaching train by whistle, bell, or otherwise, and no ordinance required such signals; but there remained the common law duty to give due warning of the approach of a train to the crossing. The evidence on the subject of whether such warning was given was in serious conflict.

*Held:* That a verdict for plaintiff settled that question in her favor, and the appellate court could not disturb it, even though, if on the jury, it might have found a different verdict.

11. CROSSINGS—*Contributory Negligence of Driver of Automobile—Question for Jury.*—In an action for damages for injuries sustained in an accident at a railroad crossing, where the view of the railroad track was obstructed, it was held that the evidence did not show contributory negligence on the part of the plaintiff as a matter of law; that reasonable men might well draw different conclusions as to the negligence of the plaintiff from the evidence, and hence the question of plaintiff's contributory negligence was one for the jury.

12. CROSSINGS—*Hearsay Evidence—Res Gestae—Whether Bell was Ringing—Harmless Error.*—In an action for injuries sustained at a crossing, the admission in evidence of a statement by a witness that when he went to the place of the accident "all the crowd was talking about the bell, that it wasn't ringing," was not reversible error. If it be conceded that the statement was not a part of the *res gestae* nor a spontaneous declaration, at most it was hearsay that, under the circumstances, could not in any reasonable probability have affected the result.

Error to a judgment of the Circuit Court of Tazewell county, in an action of trespass on the case. Judgment for plaintiff. Defendant assigns error.

*Affirmed.*

The opinion states the case.

*Graham & Bowen* and *Waller R. Staples,* for the plaintiff in error.

*Greever & Gillespie* and *Chapman, Peery & Buchanan,* for the defendant in error.

BURKS, J., delivered the opinion of the court.

This action grows out of a collision on a grade crossing between an automobile and a steam railroad train. The plaintiff, Lena D. McCall, sued to recover damages for personal injuries inflicted on her, and for the value of a one-half interest in the automobile owned by her. There was a verdict and judgment in her favor for $10,000.00 which we are now asked by the defendant to set aside.

Before stating the facts it is necessary to settle a question of pleading which has been raised, for if the contention of the plaintiff in error be sustained it will be unnecessary to decide the case on its merits.

The accident occurred September 11, 1919. On July 22, 1920, this action was brought against John Barton Payne, Director General of Railroads, and the Norfolk and Western Railway Company returnable to first August rules, 1920. Process was executed July 23, 1920. At first August rules, 1920, the plaintiff filed her declaration, and at the second August rules, 1920, the defendant filed a plea in abatement presenting the contention that in as much as the action was instituted since the termination of federal control the plaintiff's action could only be brought against the agent designated by the President under the provisions of section 206 of the transportation act of 1920 (41 Stat. 461). On August 26, 1920, the plaintiff appeared and moved to reject this plea and for leave to amend the declaration by inserting after the words "Director General of Railroads" the words, "agent designated by the President of the United States by proclamation made

the 14th day of May, 1920, pursuant to section 206 transportation act 1920," which leave was given and the amendment made, and thereupon the court rejected the defendant's plea in abatement.   The plaintiff thereupon dismissed the action as to the Norfolk and Western Railway Company, and the case was passed to a later day of the term.   On September 3, 1920, John Barton Payne, Director General of Railroads and agent designated by the President appeared specially and filed a written motion to quash the process and dismiss the action on the ground that the process was against the Director General of Railroads, and not the agent designated by the President.   On September 9, 1920, the court sustained the motion to quash the process, and without formally dismissing the action, permitted the plaintiff to again amend her declaration by inserting allegations relative to federal control and remanded the case to rules for issuance of an *alias* process.   On the same date, to-wit: September 9, 1920, and while the court was still in session, the plaintiff sued out another writ returnable to first October rules, 1920.   This new writ was not an *alias* but an original writ, not requiring the defendant to answer the amended declaration, but simply to answer of a plea of trespass on the case.   It was not issued at rules but from the clerk's office while the original case was on the docket.   At the next term of the court, to-wit: November 23, 1920, the defendant appeared specially and objected to making answer to the summons on the ground that the summons issued on September 9, 1920, was null and void, and further, because no writ tax had been paid on the new suit nor any declaration filed.   The court, however, overruled this motion, and required the defendant to plead, whereupon he pleaded the general issue.

[1-6] Upon quashing the original writ on September

9, 1920, the court should have dismissed the action. It did not formally do this but did in effect. The writ issued on September 9, 1920, was a new original writ in a new action against a new defendant to answer a plea of trespass on the case. The plaintiff's claim was not them barred by the act of limitations, and she had a perfect right to institute this new action. The fact that the court was in session at the time the writ was issued was immaterial. Plaintiffs have always had the right to institute actions at any time whether during the session or in vacation of the court, and under section 6074 of the Code rules are required to be held at the time required by law whether the court is in session or not. The plaintiff and the clerk treated the amended declaration as the declaration in the new action and the clerk took rules thereon, and the case was regularly matured for hearing. In this there was no error. The fact that the writ tax had not been paid on the new action was not a matter which the defendant could set up in bar of the action. The payment of the tax was a matter between the clerk and the Commonwealth, and the fact that the tax was not paid before the writ was issued was not such a necessary condition precedent to the issuing of the writ as to entitle the defendant to set it up in bar of the action. Nor was the plaintiff prejudiced by the issuance of an original writ instead of an *alias*. The fact that an *alias* was directed in the old action did not affect the right of the plaintiff to sue out an original writ in the new. The plaintiff had the right to ignore the old action and treat it as dismissed and institute a new action. As said in *Danville & W. R. Co. v. Brown*, 90 Va. 340, 342, 18 S. E. 278, 279. The mere fact that a writ is designated as an *alias* writ or as an original "cannot possibly affect or change its essential

character or render it less effectual as a process for bringing the defendant before the court." See, also, Burks' Pl. & Pr. (2nd ed.) p. 280, Note 17. None of the proceedings had upon the filing of the dilatory pleas affected, or could have affected, any substantial right of the defendant, nor is the conclusion at which we have arrived in conflict with the holding in *Noell* v. *Noell*, 93 Va. 433, 25 S. E. 242, or *Carter Coal Co.* v. *Bates*, 127 Va. 586, 105 S. E. 76.

[7-9] In stating the facts of the case, the statement will be made from the viewpoint of the defendant in error, as on a demurrer to the evidence by the plaintiff in error. Prior to the Code of 1919 the rule of decision in this court in a case of this kind was "as on a demurrer to evidence." For this rule, the revisors, by section 6363, substituted the language "the judgment of the trial court shall not be set aside unless it appears from the evidence that such judgment is plainly wrong or without evidence to support it." This section must be read in connection with section 6251 and the explanatory note thereto by the revisors. When so read, it is fairly plain that the judgment referred to in section 6363 is a judgment in support of the verdict. The change in the phraseology of section 6363 wrought but slight change in the law as it formerly stood. It was intended to meet exceptional cases where the verdict and judgment were plainly wrong and injustice was done because there was some evidence in favor of the verdict and judgment, though entitled to little weight, but the judgment could not be disturbed on account of the strict, and sometimes technical enforcement of the rule "as on a demurrer to the evidence." In a great majority of instances, cases at law arising under section 6363 of the Code are still to be heard in this court practically as on a demurrer to the evi-

dence by the plaintiff in error, but exceptional cases may arise where a strict and technical enforcement of that rule would work injustice, and in those cases some latitude is allowed to this court. A number of cases have come to this court on certificates of the evidence since the Code went into effect, and we have been asked to set aside verdicts because contrary to the evidence, or without evidence to support them. We have uniformly refused to do so where there was involved the credibility of witnesses whose testimony the jury might reasonably have believed, or the weight to be given to their testimony, or a question of the mere preponderance of the evidence. So it is manifest how slight a change has been wrought by the difference in the phraseology of the statute.* Trial courts have no greater power over verdicts now than they had before the enactment of the Code (see section 6252), nor has this court, but this court has always exercised the power and the duty, when not hampered by statute, of setting aside a judgment that was plainly wrong or without evidence to support it. See *Chapman* v. *Va. Real Estate Co.*, 96 Va. 177, 31 S. E. 74, and other cases cited in notes to Code, section 6363.

Viewing the case, therefore, as practically on a demurrer to the evidence by the plaintiff in error, the facts are substantially as stated in the brief of the defendant in error and are stated below.

---

*The following cases illustrate the application that has been made of section 6363 of the Code: *Lorillard Co.* v. *Clay*, 127 Va. 734, 104 S. E. 384; *Graham* v. *Com.*, 127 Va. 808, 103 S. E. 565; *Smyth Bros.* v. *Beresford*, 128 Va. 137, 175, 104 S. E. 371; *Queen Ins. Co.* v. *Perkinson*, 129 Va. 216, 222, 105 S. E. 580; *Ambrose* v. *Com.*, 129 Va. 763, 765, 106 S. E. 348, 14 A. L. R. 1268; *Tucker Sanatorium* v. *Cohen*, 129 Va. 576, 591, 106 S. E. 355; *Dupont Co.* v. *Brown*, 129 Va. 112, 121, 105 S. E. 660; *Clinchfield Coal Corp.* v. *Hayter*, 130 Va. 711, 714, 108 S. E. 854; *Forbes & Co.* v. *So. Cotton Oil Co.*, 130 Va. 245, 108 S. E. 15, and cases cited.

The following plat, drawn practically to scale from exhibits filed in the record, will be helpful in considering the evidence:

The railroad track of the defendant approaches the station of North Tazewell from the west through a cut. After leaving the cut and proceeding eastwardly toward the station the track approaches the road crossing on a curve to the left.   On the right of the track (that is, on the south) between the cut and the road crossing, 200 feet west of the crossing, is a water tank.   Where the track runs through the cut there is on the right a high hill standing between the track and the county road which approaches the crossing from the south.

The road from Tazewell to North Tazewell, where the plaintiff was traveling, approaches the railroad from the south, and crosses the railroad tracks practically at right angles, about 300 feet west of the station.

Just before the road reaches the tracks there is a rise in the ground so that the road runs up to the tracks over a short elevation. The first track that the road reaches, going from south to north (as the plaintiff was going), is what is referred to in the record as the "coal bin siding," a siding which switches off from the station siding east of the crossing and between the crossing and the station, and then runs back in a southwestern direction. The next track to be crossed is the station siding, which switches off from the main line a short distance west of the crossing and runs across the highway and on past the station, again connecting with the main line east of the station. The frog of the switch of this track is forty-five feet west of the crossing, and it so closely parallels the main line between the point where it leaves it and the highway that a train on the main line could not pass a car on this switch. After this station siding, the next track, as you cross from south to north, is the main line, and after that one or two other side tracks.

Between the coal bin siding and the station siding, and near the left or west edge of highway, is a stationary gong or bell, erected there by the railroad company for the purpose of warning travelers of the approach of trains to the crossing, and which is supposed to ring at the approach of all trains to the crossing.

Along the north side of the coal bin siding, and between it and the next track to the north, is an incline built on an A form, topped with plank about two feet wide, which is used as a runway for wheelbarrows in loading cinders into the car that usually stands on this coal bin siding, close to the west edge of the highway.

On the morning of September 11, 1919, the plaintiff, a lady forty-three years of age, and in vigorous health,

driving a seven passenger Cadillac car, approached this crossing from the south, along the road from Tazewell to North Tazewell.  Shortly before reaching the crossing she passed on her left a building known as the old postoffice building.  Before reaching this she had no view of the track to the west on account of the other buildings there and the high hill above referred to. Just after passing the postoffice she had a little view of the track to the west, down near the cut.  She could see very little of the track east of the cut, between the cut and crossing, because the coal bin siding was blocked with cars.  These cars were standing very close to the highway crossing.  There was no point after she passed the north side of the postoffice building until she got beyond the north side of the cars which were on the coal bin siding where she could see any part of the track west of the crossing.  As she approached the crossing she changed her car from high gear into low, and reduced her speed until she was driving only seven or eight miles an hour as she went up the incline toward the track.  As she drove toward the crossing she listened for an approaching train, for a bell or whistle, and heard nothing.  She passed within a few feet of the stationary crossing bell and listened for the bell and she says it was not ringing; she looked to the right (east) as she was about at the postoffice (marked on plat H. G. Peery) and saw a train standing east of the crossing, and realized that there was no danger from that.  She saw no smoke. After seeing she was safe from anything approaching from the east, she says she looked to the west, and immediately after passing the cars on the coal bin siding where she had a view to the west, she looked and found that the train was right on her.  When she reached this position where she could see to the

32

west, and when she discovered the train right on her,
the front part of the automobile was on one of the
tracks that went by the station.    This fact is testified
to by defendant's engineer, who was on the south side
of the engine keeping a lookout ahead, and he states
that when the automobile came within his line of
vision it "was just coming across that side track (the
first track south of the main line) on to the main line."
She then realized, she says, that the front part of her
car was going to be struck, and with the thought that
she might be saved if she could get into the rear seat,
she jumped from her position at the steering wheel
over the back of the front seat and into the rear of
the car just as the train struck the car.    The engine
hit the car just as her feet were going over the back
of the seat.    The train was running about twenty-five
miles an hour when it struck the plaintiff's car.

The engine struck the car about opposite the driver's
seat and carried it from there, with the plaintiff in it,
to the station.    As the car was carried along on the
front of the engine plaintiff was thrown from side to
side, and from the bottom of the car up above the side
and back again.    When the train stopped at the point
above mentioned she was taken out of the car bloody
and unconscious.

She was carried to the hospital where she remained
a little over two weeks, and was then taken to the
nearby home of her daughter.

[10] The injuries to the plaintiff were of a serious
nature, and it is not claimed that the verdict was
excessive, if she was entitled to recover anything.
But it is claimed that the defendant was not guilty
of any negligence, and that, if he was, the plaintiff is
barred of any recovery on account of her contributory
negligence.    The plaintiff claims that the defendant

gave no station signal, that no signal by whistle, bell or otherwise was given for the crossing, and that the gong at the crossing was silent.    As the crossing was in an incorporated town there was no statute requiring any such signal to be given, and no ordinance requiring any such signal to be given was offered in evidence, but there remained the common law duty to give due warning of the approach of the train to the crossing. The evidence on the subject was in serious conflict, with probably the preponderance in favor of the defendant, but the verdict of the jury settled that question in the plaintiff's favor, and we cannot disturb it, even though, if on the jury, we might have found a different verdict.    The negligence of the defendant, therefore, must be taken as established by the verdict.

On the subject of the contributory negligence of the plaintiff we have, in addition to the testimony of the plaintiff and that of witnesses examined on her behalf, certain physical facts, and the testimony of a very intelligent witness for the defendant, W. G. Werth, in no way in conflict with the testimony for the plaintiff, but in fact confirmatory thereof.    The witness, Werth, testified that after leaving Whitley's store, a point some distance south of the crossing, "I continued on towards the crossing, and as I started up that incline I went slowly, I tried to look to the west to see if a train was coming, but *I couldn't see the track until I had crossed the first track and the car was practically between the first two tracks.*    As I came up close to the alarm bell I saw it was ringing and I cut off the engine from the car and it stopped just beyond the bell where I could see down the track, and as I looked down the track there was no train in sight so I put the car in second gear and went on across the track.    As I crossed the main line track the passenger

train came in view around the curve, below the cross-
ing.'' (Italics supplied).   Werth passed over the cross-
ing about twelve or thirteen seconds ahead of the plain-
tiff.   When he stopped his car to make his observations
his body was about opposite the gong, the front wheels
of his car were on the south rail of the depot siding,
and the front of his car was about fifteen feet from the
main line track.   At that point he *"could see all the*
*way until the track disappeared in the cut, in a curve"*—
a distance of 850 feet.   This accorded entirely with
the statement of the plaintiff that she could not see
the track until after she had passed the obstruction
on the coal bin siding, and the fact that the track
could be seen for some distance from Werth's position
in his car is not disputed by any one.   It must be
accepted as a fact, therefore, that the view was ob-
structed practically up to that point, and was unob-
structed from that point to the main line, a distance
of about fifteen feet.

The plaintiff was reared in North Tazewell, was an
experienced chauffeur, had passed over the tracks
very frequently and was consequently familiar with
them.   Conscious of the obstruction to her vision she
approached the crossing at the rate of seven or eight
miles per hour, without stopping, and collided with
the train.   Had she stopped where Werth did, or even
much closer to the track, she would have been in full
view of the near approach of the train.   The obstruc-
tion to her view was such that only by stopping in a
place of safety, or moving very slowly and in no other
way, could she have had a view of the track in time
to have avoided the collision.   Traveling at the rate
of eight miles an hour, it is shown that her car could
have been stopped within six feet, but by continuing
she allowed herself only about 1–13 of a second within

which to observe the train and apply the brakes in time to avoid the collision.  Allowing six feet to stop, there only remained nine feet to be traversed.  As a view of the approaching train could only have been obtained by stopping, or by traveling very slowly, and it was not necessary for her to leave the steering wheel of her car to get such view, it was negligence not to stop, or to reduce her speed to such rate as readily to stop in a place of safety.

It is true that the gong was ringing when Werth approached the crossing, and, for the purposes of this case, was not ringing when the plaintiff approached it, but she was familiar with the crossing, and was conscious of the obstruction to her vision and must have seen and known that this obstruction would be passed, and that she would have a view of the track before actually getting into a place of danger.  She had no right to rely solely on the silence of the gong, but should have used such care for her own safety as the circumstances surrounding her at the time seemed reasonably to demand.  Her failure to do this was negligence in law.

In *McClain* v. *Chicago, etc., R. Co.*, 89 Kan. 24, 130 Pac. 646, Ann. Cas. 1914C, 699, it was said: "Ordinarily if a traveler proceeds across a railroad track without taking the precaution to ascertain if there is a train in dangerous proximity, he does so at his peril.  The application of this rule is modified to some extent by the circumstances that gates have been erected and watchmen employed at crossings.  In such case a traveler is not required to exercise the same vigilance when he approaches a track as he would at crossings not so guarded."

In the latter case of *Jacobs* v. *Atchison R. Co.*, 97 Kan. 247, 154 Pac. 1023, Ann. Cas. 1918D, 384, and

L. R. A. 1916D, 783, the defendant maintained an electric bell at a crossing at which an injury was inflicted, and the court, after referring to the *McClain Case,* which was a case where gates were operated, says: "Human intelligence guarded the crossing and operated the gate in that case. In the present case an electrical, mechanical device was intended to give warning of approaching trains. Sometimes this bell would ring when trains were passing and at other times it rang when no train was in sight. An electric bell, which at the most, can be nothing but a warning of an approaching train to those who listen, cannot be classed with a gate drawn across a street to prevent passing over railroad tracks; nor can it be classed with a flagman who stands in the street and stops those who desire to cross, when there is danger. It is more nearly analogous to the locomotive bell and whistle. Failure to ring the engine bell or sound the whistle does not relieve a traveler from the duty to look and listen before attempting to cross a railroad track. If the plaintiff's contention in this respect is correct, a railroad increases its responsibility and liability by putting in electric bells at highway and street crossings. The object in putting in electric bells is to promote public safety, not to increase railroad liability. Silence of such a bell is not an invitation to cross railroad tracks without taking the ordinary precaution."

Again, in the same opinion, it is said: "We think the better rule is that the failure of an electric bell to ring does not relieve one about to cross the railroad track of the imperative duty to look and listen before crossing. If he fails to do so he is guilty of such contributory negligence as will prevent his recovery for any injury sustained, and there is nothing to submit to the jury."

If the conclusion reached in the case at bar on the facts is different from the conclusion upon the facts in *Kimball & Fink* v. *Friend's Adm'r*, 95 Va. 125, 27 S. E. 901, then I think that case must to that extent be deemed to be overruled. In that case, the court stood three to two for affirmance. In *Southern Ry. Co.* v. *Aldridge's Adm'r*, 101 Va. 142, 43 S. E. 333; *Southern Ry. Co.* v. *Vaughan's Adm'r*, 118 Va. 692, 88 S. E. 305, L. R. A. 1916E, 1222, Ann. Cas. 1918D, 842, and *Seaboard Air Line Ry.* v. *Abernathy*, 121 Va. 173, 92 S. E. 913, the facts are so entirely different from those in the case at bar as not to require a discussion. The *Aldridge Case* is more like the case at bar than the others, but the facts are not sufficiently stated to show how far the case is applicable to the case at bar. Apparently, it was a case of a horsedrawn vehicle passing over a grade crossing at which the company was required to keep a watchman whose duty it was to warn travelers of an approaching train, and the instruction tendered and rejected gave only a partial statement of the facts, and the ruling on the instructions does not apply to the facts of the present case. While it is said in the opinion in that case that "this court has never decided that, as a matter of law, it was the duty of a person approaching the crossing of a railroad to *stop*, look and listen for an approaching train," it is also said that "we have had no occasion to say that in no case would a traveler be required to *stop* in order to look and listen," and, referring to the instruction under consideration, "if the instruction had stated all the facts, it would then have required us to say whether it was the duty of the defendant in error to *stop* in order to look and listen, but the instruction omits a view of the evidence which we deem essential to the case."

The most recent case on the subject and one that reviews most of our prior decisions, is *Director General* v. *Brown, ante* p. 222, 112 S. E. 833. It comments upon and quotes from the *Abernathy Case* to such an extent as to render any discussion of the latter case unnecessary. The *Brown Case* was confessedly a close one, but it has features which clearly distinguish it from the case at bar. In the *Brown Case*, there was a collision between a motor truck and a railroad train at a grade crossing. There were four tracks at the crossing, and the collision occurred on the third track. The distance between the first and second tracks was twenty-five or thirty feet, and between the second and third was eight feet. As the driver of the truck approached the third track his view of that track was "entirely cut off by long lines of coal cars which the defendant had stored or placed on the team track and the storage track (the first and second tracks). These lines of cars were separated only by the width of the crossing—that is to say, they extended right up to the crossing on each side." When the driver of the truck got to a point where he could see the train and be seen by the engineer thereof, he was within less than eight feet of the track, but he was "moving so slowly that, within the few feet available to him after seeing the engine, he was able to stop the truck before its front wheels quite reached the north rail of the pass track (the track on which the collision occurred), and he attempted to back away, but his reverse gear did not work promptly, and he failed in this attempt. He was in a very dangerous place, between cars on a siding that had been uncoupled for the purpose of opening the highway, and could not stop, but he approached very slowly (about four miles an hour) and continued to look and listen, and calculated that

if there was a train on the third track he could see it after passing over the second track and stop in time to avoid a collision. This calculation seems to have been a reasonable one, as the train only struck "the bumper or front springs on the truck," and would not have done this but for the fact that "his reverse gear did not work promptly." There was other evidence also tending to show that the driver was exercising ordinary care, and this court said: "Can we say, in view of the evidence as a whole, that the plaintiff's driver was bound to know, in the exercise of due care, that the looking and listening which he was doing would be ineffective? We think not." There was a colored boy riding with the driver, both of whom escaped injury, and to the suggestion that ordinary care required that this boy should have been sent forward to see that the crossing could be safely made, this court responded with the *quaere:* "But would that course have been dictated by ordinary care, or would it have been exacted by the highest degree of care?" In the case at bar, the driver was in a place of safety; in the *Brown Case* he was in a dangerous place. In the case at bar, the driver had a view of the track for 850 feet while sitting at the wheel fifteen feet from the track; in the *Brown Case* the driver had no view of the track until within eight feet of the track. In the case at bar, the driver approached the track at seven or eight miles an hour, and, although looking, when she first saw the train it was "right on her;" in the *Brown Case* the driver approached at four miles an hour and would have stopped in time to have avoided the collision if his reverse gear had worked promptly. These are some of the differences between the two cases. In the *Brown Case* it is said, "cases may and do arise in which courts properly hold that undertaking

to cross a railroad track without stopping to look and listen is negligence which, as a matter of law, bars a recovery," and this seems to me to be one of them. Drivers of automobiles must come to a realization that it is as much their duty to look after their own safety as it is of the operators of railroad trains to look out for them.

That it is the duty of one about to cross a railroad track at grade to look and listen before going upon the track, and that this looking and listening must be done from a point where it will be effective, has been so often stated by this court that it would be a waste of time and space to cite the cases. A number of the prior cases are cited in *Smith's Adm'r* v. *Norfolk & W. R. Co.*, 107 Va. 725, 60 S. E. 56, and there have been many since.

It may be conceded that, as a general rule, whether or not it was negligence in one crossing a railroad at grade to stop before going thereon is a mixed question of law and fact to be submitted to a jury under proper instructions from the court (*Kimball & Fink* v. *Friend's Adm'r*, 95 Va. 125, 27 S. E. 901; *Southern R. Co.* v. *Aldridge's Adm'r*, 101 Va. 142, 43 S. E. 333); but where, as here, looking could be made effective only by stopping, or moving very slowly, and in no other way, I think the question is one for the court. When the facts of any case are admitted or established, or are such that the court will take judicial notice of them, and but one conclusion can be reasonably drawn therefrom, the law determines the rights of the parties. This is manifest from the use of a demurrer to a pleading to ascertain whether or not a cause of action or defense has been stated in such pleading. *Forbes* v. *Southern Cotton Oil Co.*, 130 Va. 245, 108 S. E. 15.

In *Jacobs* v. *Atchison, etc., Railroad, supra,* it is

said: "This court has often said that whether negligence in a particular case is shown is ordinarily a question for a jury, but when the facts are undisputed or are definitely found by the jury, and only one conclusion can be drawn therefrom, it becomes a question of law for the court." The same is true in this State.

In the case at bar the facts show that the plaintiff was traveling in an automobile at the rate of seven or eight miles an hour, that the view was obstructed, but that the obstruction would have been passed and a view of the railroad had by stopping fifteen feet from the track without leaving the car, and that in no other way, save by stopping or moving very slowly, could such view have been obtained in time to have avoided the collision. The case has arisen, therefore, in which it must be determined whether, as a matter of law, the plaintiff was guilty of negligence in failing to stop, and I think that she was. Upon the facts stated, I am of opinion that no other conclusion can be drawn by fair-minded men.

The remarks of Sims, J., in *Wilmouth's Adm'r* v. *Southern R. Co.*, 125 Va. 511, 519-20, 99 S. E. 665, 668, in speaking of one who stepped upon the track in front of a rapidly approaching train, are applicable here. "He was on foot. There was nothing to prevent his stopping and awaiting the passing of the passenger train before attempting to proceed. * * * In the instant case the train was so close at hand when the crossing in front of it was attempted, that its visible presence superseded the necessity of any other warning to all travelers upon the highway in a reasonable exercise of their faculties of sight, if not of hearing. The preceding negligence of the defendant railroad company aforesaid was therefore immaterial. And the conduct of the plaintiff's intestate in stepping upon

the track in front of such visible danger, almost immediately upon him, must, under all the authorities, be regarded as negligence *per se* which was the proximate cause of his death. Thompson on Neg. Secs. 1666, 1667, 1672."

In *Washington & O. D. R. Co.* v. *Zell's Adm'r*, 118 Va. 755, 88 S. E. 309, decided in 1915, the duties of drivers of automobiles at grade crossing of steam railroads are fully discussed and the authorities on the subject are considered, and the conclusion reached is epitomized in paragraph 3 of the syllabus in the official report, as follows: "Drivers of automobiles are held to a higher degree of caution in crossing railroads at grade than drivers of wagons and other vehicles drawn by horses. If they cannot otherwise see or hear they must stop, look and listen even in close proximity to the track, and if they fail to do so, and make chance, not stopping, their guaranty of safety, and are injured by moving trains, they cannot recover. Although it may sometimes afterwards appear that it would have been safer not to have stopped, still if men choose to act upon chance instead of caution in such cases, they violate the general rule of safety established by reason, experience and authority, and are guilty of negligence which will bar recovery."

The constant use of highways by motor vehicles of all kinds has greatly increased the traffic over grade crossings and correspondingly multiplied the collisions thereat. Many of these vehicles are of such size and weight as to make collisions a menace not only to the occupants thereof, but to innocent passengers and employees of the trains. It is necessary, therefore, that the drivers of such vehicles should approach such crossings with their vehicles under such control and at such rate of speed that they can stop, if neces-

sary, as soon as they reach a point where they can obtain a view of the track and of an approaching train, even though in close proximity to the track. This is but the application of the rule that they must look and listen at a point where looking and listening will be effective. Such vehicles are so constructed that their speed can be reduced to a practical minimum of locomotion, and there are few, if any, grade crossings of which a view cannot be had of the track and of an approaching train for some distance when in close proximity to the track, and yet in a safe place. It may or may not be necessary to stop, dependent upon the circumstances of the particular case, but the speed of the approach and the control of the vehicle must be such that it can be stopped if necessary to avoid a collision. In the case at bar, this rate of speed was not observed, and the negligence of the plaintiff in this respect was the proximate cause of her injury.

The case at bar is not one in which there is any fact to be found by a jury. In the foregoing statement of the case there is not a disputed fact. The plaintiff has been given the benefit of every reasonable doubt and of every inference that a jury might fairly have drawn from the testimony in her behalf. Except as to certain physical facts testified to by the witness Werth, and which are not controverted, the statement of facts is taken substantially from the brief of counsel for the defendant in error. Some of the witnesses for the defendant in error place the point from which she could have seen the approaching train much further from the track than does the testimony of Werth. I have given her the benefit of the doubt and placed the point of observation at the closest point to the track, to-wit: fifteen feet from the track. I have conceded the negligence of the plaintiff in error, although

the decided preponderance of the evidence was against such negligence. The question presented for decision is: If the facts hereinbefore stated had been set forth in the declaration and the defendant had demurred thereto, should the demurrer have been overruled? To be still more concrete, if the declaration had stated that the view of the plaintiff was obstructed until within fifteen feet of the track, and that the track was then plainly visible to the plaintiff, sitting at the steering wheel, for 850 feet, that the plaintiff was thoroughly familiar with the crossing, and approached it at the rate of seven or eight miles an hour, but did not see the train until it was right on her, and the defendant had demurred thereto, should the demurrer have been overruled? It would seem to be selfevident that it should not have been. To hold otherwise is to hold that the operator may drive his car into a rapidly moving train in plain view with impunity. Of course, such could never be the law. But however this may be, the case presents no question of fact for the decision of a jury. The facts relating to the plaintiff's negligence are not disputed. They are stated concretely in the question last above propounded. Upon such a conceded state of facts, the law pronounces its judgment, and a jury is not the proper trinunal to decide what that judgment is. The law says that the plaintiff was negligent, and that her negligence, if not the cause of her injury, at least proximately contributed thereto.

The conditions of travel and traffic upon the highways have greatly changed in recent years, and it is desirable that the rules prescribed for the safety of the traveler shall be as specific as practicable. The courts cannot prescribe such rules, but they may with propriety apply old principles to the changed conditions,

and that is all that is done when the driver of an
automobile is required so to apply the "look and
listen" rule as to make it effective.    In addition to
what was said in the *Zell Case*, and to what has already
been said in this case, the following quotation from the
opinion of Burnett, J., speaking for the court, in
*Robinson* v. *Oregon-Washington R. Co.* (Dec. 1918),
20 Ore. 490, 176 Pac. 594, 598, seems so apposite that
it is given at length:

"With respect to accidents at railway crossings, and
as a sort of exception to the general precept that
negligence is a question for the jury, the rule has been
made more specific in detail on account of so many
circumstances that are common to all such cases, so
that what is required of the traveler has been con-
centrated into more exact statements than the mere
generality that he must use reasonable diligence to
avoid an accident.  As the means of highway travel have
been developed from conveyances drawn by cattle or
horses into self-propelled vehicles, including the highly
developed automobile, the rules are made still more
precise, so as to correspond with the changed condi-
tions.    The modern automobile is a machine which
may be controlled within very narrow limits.    It may
be run with safety very much closer to a moving train
than would be prudent with a team of spirited horses.
At the same time, when carelessly managed, it may
become an engine of great destruction, even to the
possible derailment of a railway train.    The situation,
when an automobile approaches a railroad crossing, is
only in degree different from that where the train of
one railway is about to cross the track of another.
The universal practice among railroad men is for the
train to come to a full stop before crossing the other
track.    Of course, in the absence of legislation, we

cannot impose so strict a rule upon the motorist; but
the fact remains that the automobile and the loco-
motive are both self-propelled vehicles, and it is but
pressing the analogy a little to say they are both in a
sense railway trains.   Considering their great flexi-
bility of motion, and their great possibility of doing
damage, it is but simple justice to demand of auto-
mobiles a more particular observance of the rule to
look and listen than is required of the driver of a team
of horses.   On the one hand, it is easier for the
former to effectuate safety to all concerned; and, on
the other, neglect of duty is generally fraught with
more serious consequences.   It has always been the
rule, crystallized into one of law, as stated by Mr.
Justice Bean in Blackburn v. Southern Pacific Co., 34
Or. 215, 55 Pac. 225, thus:

" 'It is a principle of law, firmly established in this
State as elsewhere, that the failure of a person about
to cross a railway track on a highway, at grade, to
look and listen for an approaching train is negligence
per se, and will bar a recovery for an injury received
by a collision with a train at the crossing.'

"If, from a place of safety on his way, the traveler
in control of the vehicle in which he is riding, can
obtain a view of the coming train, he must look upon
the course of the train from that point, and this re-
sponsibility is constant until the danger is past; that
is, until he is safely across the railway track.   The
duty is constant because the danger is incessant.
Instead of being intermittent, it grows as the traveler
gets near the crossing, and reaches its climax only as
he actually crosses the track in his passage.   This
obligation he owes, not only to himself, but also to
those on the train, whether passengers or the laborers
employed in its operation.   He must not allow his

selfish little convenience to override this duty so well grounded in common sense.

"All the precedents make it incumbent upon the traveler to look and listen.    Neither of them can be eliminated, without its use is practically impossible. The law does not excuse him from exercising both of them, unless there is no reasonable opportunity for that purpose.    There is quite as much reason for his stopping so he can see as for stopping so he can hear, if there be any zone of safety from which he can see, and there are obstructions which prevent him from seeing a moving train without halting in that zone.    As applied to Weygandt, the testimony on his behalf, in the light most favorable for his administrator, shows that while yet his car was three or four feet from the track the locomotive could be seen at a distance of from eighty to 100 feet.    Even that space would have been clearance sufficient to prevent collision.    The locomotive, passing so near, would not have frightened or disturbed his machine, as if it had been a spirited team he was driving.    We are not deciding within how short a distance an automobile can be brought to a standstill from any given speed.    We are only saying that with his car halted three or four feet out of the way of the locomotive a chauffeur safely may look at a train moving on the track before him.    There was the railroad track almost in his face in open view.    The crossing sign told him in plain language 'Look out for the Cars.' His own sight advised him 1,000 feet back that the crossing was there and that he would have to pass over it.

"The administrator claims his decedent could not see the train because of the intervening bluff. If this be true, how could he expect the trainmen to see him? If it was negligence for them not to see him under such

33

conditions, it was equally negligent for him not to see
the train that they were operating. Looking at the
impenetrable hill was futile. It was Weygandt's duty
to look upon the only place whence the danger would
come, viz., upon the track, for which view he had safe
and ample opportunity before going in front of the
train. *Cathcart* v. *O. W. R. & N. Co.*, 86 Or. 250, 166
Pac. 308. He was guilty of contributory negligence in
not looking from that place of safety, stopping, if
necessary, for that purpose, before advancing to the
point of collision. His neglect of that duty cost him
his life, and his estate must bear the loss."

[11] The other members of the court concur in so
much of this opinion as deals with the pleadings and
the construction of section 6363 of the Code, but are
of opinion that the evidence hereinbefore set out does
not show negligence as a matter of law on the part of
the plaintiff, Mrs. McCall; that reasonable men might
well draw different conclusions as to the negligence of
the plaintiff from the evidence recited, and hence the
question was one for the jury. They also think that
*Kimball & Fink* v. *Friend's Adm'r*, 95 Va. 125, 27
S. E. 901, was correctly decided, and adhere to the
principle announced in that and subsequent kindred
cases. The result is that the judgment of the trial
court must be affirmed, unless some error was committed
in the admission of testimony, or in the ruling on the
instructions, which are the only other errors assigned.

[12] The court is unanimous in the opinion that no
reversible error was committed in the admission of
testimony. It is true that the witness, Ireson, did
volunteer the statement that when he went up to the
station at the time of the accident, "all the crowd was
talking about the bell, that it wasn't ringing," but the
circumstances under which the statement was made,

the explanation given of it at the time the witness was testifying, and the use that was made of it, would not justify a reversal on account of its admission, if it be conceded that it was not a part of the *res gestae* nor a spontaneous declaration, in view of other testimony in the case. At most it was hearsay that, under the circumstances, could not in any reasonable probability have affected the result. The other objections to testimony admitted are not serious enough to justify discussion.

Four instructions were given for the plaintiff and six for the defendant. Eight instructions tendered by the defendant were refused. They need not be considered in detail. Some of the instructions refused were rightly refused because the jury was already sufficiently instructed. The others presented, more or less concretely, the question already fully discussed, did the conduct of the plaintiff amount to negligence as a matter of law. Upon this question four of the judges think no error was committed. The result is that the judgment of the circuit court must be affirmed.

*Affirmed.*

BURKS, J., dissenting in part.