## Richmond.

### HONAKER V. WHITLEY.

#### January 16, 1919.

1. NEGLIGENCE—*Injury From One of Two Causes—Burden of Proof —Preponderance of Evidence—Malpractice of Dentist.*—In the instant case plaintiff suffered from a fracture of the jaw. His jaw had been treated by two dentists, defendant and another. It appeared from the evidence that the fracture was caused by the one treatment or the other, but the evidence did not establish that defendant's treatment more probably caused the fracture than that of the other dentist.

   *Held:* That, plaintiff could not recover.

2. NEGLIGENCE—*Injury From One of Two Causes—Burden of Proof —Preponderance of Evidence.*—Where damages are claimed for injuries which may have resulted from one of two causes, for one of which the defendant is responsible, and for the other of which he is not responsible, the plaintiff must fail if his evidence does not show that the damages are produced by the former cause. And he must also fail if it is just as probable that the damages were caused by the one as by the other, since the plaintiff is bound to make out his case by a preponderance of evidence.

Error to a judgment of the Law and Equity Court of city of Richmond, in an action of trespass on the case. Judgment for plaintiff. Defendant assigns error.

*Reversed.*

This is an action of the defendant in error, as plaintiff in the court below, seeking to recover damages of the plaintiff in error, as defendant in the court below, for certain injuries alleged to have been caused the plaintiff by malpractice on the part of the defendant, as a dentist. The parties will be hereinafter referred to as plaintiff and defendant in accordance with their positions in the trial court.

The declaration contains two counts. The causes of action alleged in these counts both depend upon the allegation of fact that the defendant in attempting to pull a tooth of the plaintiff fractured his jaw bone. }

The plaintiff recovered a verdict, which defendant moved to set aside as contrary to the law and the evidence. This motion was over-ruled; judgment was entered in the court below in accordance with the verdict, and the defendant brings error.

Upon the question whether there is any evidence in the case of sufficient probative value to establish the fact that the defendant fractured the jaw of the plaintiff, the material facts (the evidence being considered under the statutory rule applicable in such cases) are as follows:

The plaintiff had what is known and designated by dentists as an impacted wisdom tooth, or third molar, on the left hand side of the lower jaw. That is to say, this wisdom tooth had not grown out so as to be free of the tooth in front of it—the second molar on the lower jaw—but in a slanting way towards the second molar and in such fashion that the front of the crown of the wisdom tooth pressed against the rear of the second molar so that the wisdom tooth could not be extracted by the regular method of extracting teeth, and created an aperture or "crack," as described by the plaintiff, between these teeth, in which food lodged and "annoyed" the plaintiff, as he testified. He testified that the only trouble he had was that when he would eat anything it bothered him, it was troublesome to get it out of the cavity aforesaid. In this condition the plaintiff went to the defendant, a dentist, on a Tuesday, October 27th, for treatment. The defendant on that day treated the gum of the wisdom tooth to see if that would give relief. No relief resulting from such treatment the plaintiff returned to the defendant, two days afterwards, to have the wisdom tooth pulled. The defendant explained

to the plaintiff that the wisdom tooth had grown up against the second molar in such a way that he would have to first pull the second molar, a good tooth, in order to pull the wisdom tooth. The plaintiff told the defendant "I had rather lose this good tooth and stop that nasty feeling in my jaw;" whereupon the defendant said: "If you want to give up that good tooth, come down Sunday morning and I will deaden your gums," and the defendant also told the plaintiff that "by pulling the good tooth next to it" (the wisdom tooth), "he could take it out." Accordingly the plaintiff went to the defendant on the Sunday morning named, to have the operation aforesaid performed. He testified that at the time, "My jaw did not bother me; only when I would eat anything it bothered me, it was trouble to get it out. But I ate a hearty breakfast that Sunday morning; it didn't pain me any; I felt as well as I ever did in my life, I felt fine."

The testimony of the plaintiff as to what then transpired, is as follows:

"A. When I went to Dr. Honaker's office that Sunday morning, I think he first cocained my gums, then he pulled on the good tooth. He yanked on it three or four times. I said, 'That certainly does hurt.' He said 'wait.' Then he yanked on it again, I think the fourth or fifth time and I felt sick.

"Q. How did the force he used that fourth or fifth time, the last time, compare with the force he used before.

"A. Why, naturally, he used a lot of strength, because Honaker showed me his hand, the forceps made a red place in his hand, and during the time he broke the tooth off and he said, 'I have broken your tooth.' Of course I was very sick. He said 'You know I have pulled hard; to show you, look at the palm of this hand;' and he went and got a towel and bathed my forehead. I was sick, I didn't faint, but I was very sick. He said, 'better go in there in the

ladies parlor and lay down.' I said, 'Doctor, you better go on and take the tooth out.' He said 'In the condition you are in, I wouldn't think of putting the forceps in your mouth.'

"Q. State Dr. Honaker's condition at that time; was he calm or not?

"A. Dr Honaker seemed very nervous. After I laid down a little I felt better, but it still pained me.

"Q. Where was it paining you?

"A. Up here, (indicating near left ear).

"Q. Did you suffer pain in your ear?

"A. Not then; I did that night.

"Q. Your jaw pained you where?

"A. Right here.

"Q. Opposite the top of your ear?

"A. Yes.

"Q. Did you tell him then that your jaw there was hurt-you, was that the time?

"A. Yes, I told him, and then that night—

"Q. What did he tell you at that time?

"A. He said the cocaine was what made me sick, that I had swallowed cocaine, and it would wear off in a few minutes. I came home and that evening my jaws locked.

"Q. How long after he pulled was it before your jaws locked?

"A. It wasn't more than a few hours, a couple of hours any how *   *   *."

It was the opinion of the defendant, as expressed to the plaintiff, that the locking of the jaws was due to "nothing but an abscess"—and he prescribed the use by the plaintiff, of listerine, or salt water or some mouth water. Notwithstanding the use of such remedies, the suffering of the plaintiff grew worse and his jaws continuing to be locked he on Thursday next following said Sunday, went to Dr. Wood, a dentist and specialist on the subject, for treatment.

The· evidence for the plaintiff gives no details of what Dr. Wood did except that the latter "put"·the plaintiff "under gas * * and took out the teeth * * the root of the one Dr. Honaker broke and the wisdom tooth."

Dr. Wood testified in the case as a witness for the defendant. His testimony is the only evidence in the case giving the details of what he did, and as his statement on that subject is not controverted by any testimony for plaintiff we must regard it as establishing the facts as to such details.

Dr. Wood testifies that he gave him nitrous oxide and oxygen gas as an anesthetic. The material testimony of Dr. Wood as to what occurred during his operation, after he got the plaintiff under the influence of the gas, is as follows:

"Q. At that time, after you got him under the influence of the anesthetic, did you see any symptoms of a broken jawbone?

"A. No, I got him under the influence of the anesthetic and then prized his mouth open. One difference between nitrous oxide and oxygen, and chloroform and ether, is that we do not get the relaxation of the muscles under nitrous oxide and oxygen that we do under chloroform 'and ether; they get a little air, just enough to make them restless, we do not get a complete relaxation; so we have to use these gags—open the mouth with any thin instrument and put these gags in. (Exhibiting two gags.)

· "Q. Did you use both gags?

"A. Yes, sir, in this particular case, and in a number of cases I have. Those muscles were so strong and inflamed that I could not get them open with one hand and it is sometimes all we can do with both hands to prize them open.

"Q. Does it take a great deal of force to do that?

"A. It takes a great deal  *  *."

\*     \*     \*     \*     \*     \*

"Q. How did you get the mouth open sufficiently to get the gags in?

"A. Take a very thin instrument and work that in and gradually get the jaw open until you can get this gag in \*  \*  you have to prize it open with a sharp instrument.

\*     \*     \*     \*     \*     \*

"Q. Doctor, when you opened his mouth with the gag, the muscles were rigid, were they?

"A. Yes, sir.

"Q. What was the condition of the condyle at that time?

"A. Well, I don't know.

\*     \*     \*     \*     \*     \*

"Q. If you opened the mouth by gags that would shove the lower jaw down, wouldn't it?

"A. Yes, sir, and it puts a great deal of strain on the neck of that condyle. You can readily see, if you have a large muscle attached all around here, and you prize this mouth open here, you are putting practically the whole weight of whatever weight you are putting in prizing there, right on the neck of this condyle here.

"Q. Which is the strongest then the muscle or the neck of the condyle?

"A. You can lift a locomotive almost on that muscle— it is hard to say how strong that muscle is—without severing that muscle.

"Q. You can't lift a locomotive on that condyle, can you?

"A. No, sir. It is hard to say how strong that muscle is; but I have known a person to bite three or four hundred pounds in chewing on a surface the size of one of those teeth.

"Q. If that be true and you put one of those gags on a man's jaw, as you have stated already, would not the muscles have to give way, or the jawbone slip out of place or give way?

"A. Yes, sir; something would have to give way, if you have power enough put upon it to open it up.

"Q. And this man's jaw did open?

A. "Yes, sir, and there was a dislocation, as I thought.
 * * *

"Q. Was it possible for you to have broken his jawbone when you prized down on those two gags, as you have stated?

"A. Oh, yes, it was possible for me to break it.

"Q. Repeating my question, the muscle had to give way, the jawbone had either to break or give, or the condyle had to slip forward and out of the socket?

"A. Yes, sir, and one of them did happen, which I thought was this condyle slipping out of the socket, which there is no way of telling under that kind of anesthetic."

The fact that the fracture had occurred was not known to anyone until it was disclosed by an X-ray photograph which Dr. Wood had taken a few days after he had performed the operation aforesaid on the plaintiff and sent him home. Dr. Wood testifies that on the 8th or 9th of November he called on the plaintiff at his home, "and from the pains he had and exhibited in the temporal region I (he) suspected condyle fracture." Dr. Wood on November 9th had an X-ray photograph taken which disclosed the fracture of the neck of the jawbone where it enters the socket known as a "condyle fracture," and it was not a splintering of the bone but a complete break of it. "It was broken square in two" as stated by Dr. Wood.

On the subject of the cause of the fracture aforesaid, Dr. Wood testified on cross-examination as follows:

"* * I will say from the fracture that his" (plaintiff's) "jaw was broken either by me or Dr. Honaker.

"Q. There is no question in the world but that either you or Dr. Honaker broke it?

"A. I don't think there is a question.

"Q. If there was a very severe pull on that tooth, might not that have broken it.

"A. It might.

"Q. In other words, the angle of the break was just such as you would expect from a severe pull?

"A. By a pull or pressing upon the jawbone; it wasn't from an accident. That jaw, as I said before, did give way or dislocate. I don't mean to leave the impression that Dr. Honaker did break it because I operated on that jaw four or five days after he operated, and I didn't find the fractured jaw out, and I am positive that either he or I broke it."

The uncontradicted evidence in the case is that a condyle fracture is exceedingly obscure and difficult to diagnose, the most difficult fracture a dentist has to diagnose. The uncontroverted evidence also is that aside from an X-ray, the only symptoms of such a fracture are temporal pains, a very severe pain in the temple when the patient attempts to open his mouth. But the uncontroverted evidence is further, that such pains may be also due to some other cause, such as a severe stretching of the ligaments around the condyle of the jaw, caused by pulling upon a tooth in an attempt to extract it.

The plaintiff introduced only one expert on the subject of what or who caused the fracture in question, Dr. Walton, a dentist. He was asked and answered the following questions, on that subject:

"Doctor, suppose I were to tell you of a patient who * * went to a dentist on a given day to have an impacted wisdom tooth removed, and that the dentist undertook to re-

move the sound molar next to the wisdom tooth, and in attempting to remove that strong molar tooth the dentist pulled very violently a number of times, and finally gave a final hard pull sideways, whereupon the patient immediately became very, very sick and had a violent pain right opposite the ear on the left side; and that the patient, before that effort was made to remove the tooth, could use his jaws perfectly free, but almost immediately after this effort was made and after he became violently sick, his jaws locked; what would you say happened?

"A. Well, I don't know that I could say positively what happened.

"Q. Of course you cannot say beyond all human probability, but what would you think?

"A. I would suspect, maybe, but we can't always tell—I would suspect one of two things happened; a stretching of the ligaments causing inflammation around the condyle of the jaw or a fracture of the jaw, I couldn't say positively, but I would suspect it.

"Q. Would you suspect stretching of the ligaments around the condyle or a fracture?

"A. Yes, you might suspect it.

"Q. You would feel reasonably sure that one of these things had happened?

"A. In a way I would, but there is no way to determine those things unless you have an X-ray.

"Q. Is it or is it not, a very dangerous thing for an ordinary dentist, with ordinary forceps, to undertake to pull a perfectly sound, strong, second molar which is impacted with the third molar?

"A. It is not dangerous to pull out the second molar any more than any other tooth; the second molar would come all right, but the third molar is the one in question.

"Q. And that is a very dangerous thing?

"A. Yes, I consider it so."

On re-examination this witness was asked and answered questions as follows:

"Q. Doctor you recall that hypothetical question I asked you a few moments ago—if a patient came to you and said that an effort had been made to pull out his teeth and he had this violent pain, and so forth?"—referring to the question to Dr. Walton first above quoted.

"A. Yes.

"Q. Just add to that this: Suppose that just a few days after that time it is definitely and finally discovered that his jaw had been in fact fractured and broken squarely in two at the point where this line is drawn" (referring to a line drawn on the temple of a skull used as an exhibit before the jury) "what is your opinion, also adding that other fact about what probably happened there when this sudden jerk was made and this violent pain came; I have now added the fact now discovered that the jaw was fractured. Would you say that the jaw was probably fractured at that time?

"Mr. Pulliam: I object to that, if your Honor please, we don't know when the thing was discovered. Let him put that in the question.

"By Mr. Moore:

"Q. Say in a week or ten days afterwards, and that all that has happened in the mean time is that another dentist, who is an expert, Dr. Wood, has simply extracted the root of the second tooth and then lifted out the third molar.

"A. Was any stress put on that jawbone at that time by the second dentist?

"Q. The stress necessary to open the jaw enough to do it.

"A. I couldn't say which dentist did it.

"Q. In all probability who did it?

"A. I cannot answer.

"Q. Would it throw any light on it if the fracture was

that way (indicating), rather than straight across?

"A. No, because the other dentist might have gotten force enough in there to break that."

*Byrd, Fulton & Byrd,* and *W. C. Pulliam,* for the plaintiff in error.

*Jas. R. Sheppard, Jr.,* and *T. J. Moore,* for the defendant in error.

SIMS, J., after making the foregoing statement, delivered the following opinion of the court.

The pivotal question in this case is this:

[1] Is there any evidence therein tending to show that it is more probable that the defendant rather than another dentist, Dr. Wood, fractured the jaw of the plaintiff?

As appears from the above statement, the evidence does establish the fact that either the defendant or Dr. Wood caused such fracture; but is there any evidence going beyond that, tending to show that it was more probable that the defendant did it?

Taking all that the plaintiff and his witnesses say of the conduct of the defendant to be true, it still amounts to no more than this, that the defendant may have caused the fracture. It does not controvert, negative or weaken in any degree the fact that it is equally, if not more, probable that what Dr. Wood did caused the fracture.

The first positive evidence of the fracture is that supplied by the X-ray photograph, but that was not taken until a time after both the operation by Dr. Wood as well as that by the defendant had occurred, so that the X-ray photograph affords no evidence whatever on the question under consideration.

The only occasion on which the defendant could have broken the jaw was when he attempted to pull the second

molar or second lower jaw tooth of the plaintiff next to the impacted wisdom tooth. The plaintiff's own expert witness testifies, on that subject, as quoted in the above statement, in substance, that it was not more probable that such attempt to pull such tooth caused the fracture, than the pulling of any other tooth, except an impacted wisdom tooth. And the defendant did not pull or attempt to pull the impacted wisdom tooth.

The only remaining evidence in the case bearing on the probability that the defendant caused the fracture, was as to the violence of his pulling and the symptons exhibited by the plaintiff following such pulling and prior to the operations by Dr. Wood. Plaintiff's own expert witness, Dr. Walton, testified, in effect, as shown by the quotations from the testimony in the above statement, that none of these things furnished any evidence that the defendant, rather than Dr. Wood, caused the fracture.

The symptoms of a very severe pain in the temple was in truth the only distinctive or characteristic evidence in the case tending to support a diagnosis that the fracture occurred before the operation by Dr. Wood; but Dr. Walton, the plaintiff's own expert witness testified, in substance, that this same symptom with equal probability, so far as it existed prior to Dr. Wood's operations, may have been caused by a stretching of the ligaments causing inflammation around the condyle of the jaw, or by a fracture of the jaw. And a stretching of the ligaments causing inflammation around the condyle of the jaw, was, of course, but a natural and probable result of the violent pulling by the defendant in his attempts to extract the second molar aforesaid.

Dr. Wood's testimony above quoted, to say the most of it in favor of the plaintiff, leaves it equally probable that he fractured the jaw bone of the plaintiff as that the defendant did so.

There were two other dentists introduced as expert witnesses for the defendant and the defendant also testified in the case in his own behalf, in the testimony of none of whom is found any evidence on which the plaintiff could rely to supply a preponderance of evidence in his favor on the probability in question, and, therefore, none of such testimony has been referred to in the statement above.

[2] We must say of this case, therefore, what is said by this court in the case of *C. & O. R. Co.* v. *Whitlow,* 104 Va. 90, 94, 51 S. E. 182, 183 :

"The case here falls under that class sanctioning the rule as stated by all text writers, that where damages are claimed for injuries which may have resulted from one of two causes, for one of which the defendant is responsible, and for the other of which he is not responsible, the plaintiff must fail if his evidence does not show that the damages are produced by the former cause. And he must also fail if it is just as probable that the damages were caused by the one as by the other, since the plaintiff is bound to make out his case by a preponderance of evidence."

We are constrained, therefore, to set aside the verdict and judgment under review and grant the defendant a new trial.

*Reversed.*