# Richmond.

## GEORGE G. KENDRICKS v. CITY OF NORFOLK, ET AL.

### September 25, 1924.

1. NEGLIGENCE—*Evidence—Inferences—Inference Drawn by the Witness after the Accident—Case at Bar.*—In the instant case, an action for personal injuries suffered by plaintiff from a hook and ladder truck swerving from the street and striking plaintiff upon the steps of a house, the plaintiff relied upon the condition of the railroad track and of the street pavement as constituting negligence on the part of the defendants. Evidence for the defendants tended to show that the state of the pavement and the track were not so unusual as to constitute negligence, and that in any event these conditions were not the proximate cause of the injury to plaintiff. The court was satisfied that it was physically impossible for the heavy truck to have been diverted from its course and one of its driving wheels to have been caught in a depression along the rail of the track, as was endeavored to be shown by the principal witness for the plaintiff, and was convinced that this witness did not see the wheels of the truck get caught in such depression or in the frog of the track, but reached this conclusion upon inspecting the place after the accident.

   *Held:* That such inference drawn by the witness from his examination of the place of the accident afterwards was not affirmative, and was without probative value.

2. NEGLIGENCE—*Burden of Proof—Actions for Personal Injuries.*—The burden of proof rests upon the plaintiff to establish the negligence of the defendant in actions for personal injury by evidence having sufficient probative value to allow of a conclusion, drawn from the testimony as to the facts, to be made that the negligence fairly appears.

3. APPEAL AND ERROR—*Verdict Disapproved by the Trial Court—Weight to which such Verdict is Entitled.*—A verdict which has been disapproved by the trial judge is not entitled to the same weight on appeal as one that has been approved by him. The very fact that he is given the power to set aside a verdict as contrary to the evidence necessarily means that he must, to some extent at least, pass upon the weight of the evidence.

4. APPEAL AND ERROR—*Appeal from Judgment of Trial Court Setting Aside Verdict—Plaintiff in Error to Show Error.*—It is incumbent upon the

plaintiff in error on appeal from a judgment setting aside a verdict to show error on the part of the trial judge in setting aside the verdict and entering judgment on the evidence.

5.  APPEAL AND ERROR—*Negligence—Where Accident Might have Occurred from One of Two Causes—Case at Bar.*—In the instant case, an action against a city and a street railroad for injuries sustained by plaintiff from the skidding of a hook and ladder truck from the road to the steps of a house upon which he was standing, the most that could be said, as between the two theories of the respective parties, is that it is just as probable that the injuries were caused by the driver of the truck trying to steer out of the way of a parked car and the consequent skidding of the truck, as it is that the accident occurred from a wheel of the truck becoming imbedded in a hole between the rail and the side of the track in the street adjoining the rail, and so throwing the truck out of its course and causing it to zigzag.

*Held:*  That this brought the case within the purview of the rule that where damages are sought for injuries which may have resulted from one of two causes, for one of which the defendant is responsible, and for the other of which he is not responsible, the plaintiff must fail, if his evidence does not show that his injuries were produced by the former cause; and he must also fail if it is just as probable that the injuries were caused by the one as by the other, since the plaintiff is bound to make out his case by a preponderance of the evidence.

Error to a judgment of the Court of Law and Chancery of the city of Norfolk, in an action of trespass on the case.   Judgment for defendants.   Plaintiff assigns error.

*Affirmed.*

The opinion states the case.

*Wolcott, Wolcott & Lankford* and *W. L. Devany, Jr.,* for the plaintiff in error.

*E. R. Williams, Venable, Miller, Pilcher & Parsons, R. W. Peatross, R. B. Spindle, Jr.,* and *John B. Jenkins, Jr.,* for the defendants in error.

CRUMP, P., delivered the opinion of the court.

This was an action of George G. Kendricks, the plaintiff in error here, against the city of Norfolk and the Virginia Railway and Power Company, as joint defendants, to recover damages for personal injuries to the plaintiff, alleged to have been caused by the negligence of the defendants. There was a verdict for the plaintiff. This verdict was set aside by the trial court and judgment entered for the defendants in that court under section 6251 of the Code.

Brewer street in Norfolk runs north and south. Bute street, running east and west, crosses Brewer street. The next street crossing Brewer street south of Bute street is Charlotte street. The accident complained of occurred on Brewer street 110 or 115 feet south of Charlotte street. Brewer street is a narrow street, twenty feet in width from curb to curb, with a single track of the defendant railway company on it. It is paved with smooth asphalt, slightly rounded in the center. Going south on Brewer street on this block, the distance, on the western or right-hand side, from the western rail of the track to the curb or the pavement is about eight feet, nine inches, the distance between the rails five feet, three inches, and from the eastern rail to the left-hand or eastern curb of the street six feet, thus making up twenty feet, the width of the street.

On February 11, 1922, between seven and eight o'clock in the evening, in answer to a fire alarm, two lighter fire wagons followed by a hook and ladder truck came west on Bute street and made a left-hand turn at the corner of Brewer into that street, and continued down Brewer street somewhat on the right-hand side of the street. The fourth house from the southeast corner of Brewer and Charlotte streets, on the right-hand side of Brewer street going south, was the residence of a Mrs. Brophy, in which the plaintiff Ken-

dricks resided as a boarder.   This house had a front
porch with steps leading from it, not in front, but on
the northern end of the porch.   On the evening in
question the street pavement was damp from some
prior rain or mistiness during the day.   The plaintiff,
while in the house of Mrs. Brophy, heard the fire appa-
ratus coming down Brewer street, and knowing that
the little child of Mrs. Brophy was out on the street,
ran out to look after the safety of the child, and, as he
did so, the two first fire wagons passed and the hook
and ladder truck was approaching.   He found the child
was running into a place of safety.   The plaintiff, who
was going out on the pavement, then returned to the
steps leading the child by the hand, and as he started
to ascend the steps to the porch the hook and ladder
truck veered to the right, crossed the pavement, crashed
into the steps, struck the plaintiff and inflicted very
serious personal injuries upon him.

The evidence in the case shows that on Charlotte
street west of Brewer street there was a portion of an
unused track which curved to the right or south at the
corner of Brewer street and connected with the track
running south on Brewer street, the point of the switch
being sixteen or eighteen feet from the line of the curb
of Charlotte street.   The distance from Charlotte street
to Mrs. Brophy's residence was 110 or 112 feet.

The evidence shows that the plaintiff relied upon the
condition of the railroad track at the corner of Charlotte
and Brewer streets, and of the street pavement imme-
diately adjoining the rail at several points near the
switch, and further south towards Mrs. Brophy's house,
and upon an alleged faulty condition of the frog or
switchplate at the switch, as constituting negligence on
the part of the defendants.   The defendants by their
evidence endeavored to show, first, that such defects

as were shown to be existing in the condition of the railroad track, and in the worn state of the pavement of the street, were not so unusual as to constitute negligence; and they further attempted to prove that in any event these conditions were not the proximate cause of the injury to the plaintiff.

Assuming for the purposes of this case that the evidence is sufficient to establish that the condition of the junction of the two tracks and the holes in the street adjoining the rail of the track constituted negligence on the part of the defendants, we will consider the question whether the evidence shows that the accident and injury to the plaintiff were caused by these conditions for which the defendants would be responsible, or whether the accident is to be referred to some other cause.

The evidence for the plaintiff as to the cause of the accident consisted of the testimony of the plaintiff himself, of the witness, Noona, who on the evening of the accident was in his store at No. 444 Brewer street, on the east side of that street south of and next to the corner of Charlotte street; the witness, Marino, who was standing on the southeast corner of Charlotte and Brewer streets; and Mrs. Mary Brophy, who was in her house at the time of the occurrence.

The plaintiff testified that he, at the time, was in the kitchen of No. 445 Brewer street, Mrs. Brophy's house, and hearing the fire apparatus he went out to look after the boy. At that time the two fire wagons passed and the hook and ladder truck was then coming down the street towards the house. He caught hold of the little boy, got him behind the gate, and then the truck was almost up and came towards him, and he just had time to jump from the gate to the steps when the truck came across the sidewalk, broke down the fence and

caught him at the foot of the steps; that when he had gone as far as the gate in running out, the big truck made a crash at the corner and it began to go first one way and then the other; that there was a Dodge car sitting on the right-hand or western side of the street between the corner and his house, near the house and close to the curb; that the first thing which called his attention to the hook and ladder truck was the crash which he heard.   The witness, Noona, who was in his store on the opposite side of Brewer street next to the corner, testified that there were two automobiles parked on the right side of the street, his own near the corner and another one in front of his.   He heard "the knocking in the corner, and the hook and ladder truck struck something.   He then went out to look for his children and saw the truck in the Brophy porch; that there was about fifteen feet between the automobile and the Brophy house.   The witness, Marino, testified that he was a seaman, twenty-one years old, and, standing on the southeast corner of Charlotte and Brewer streets on the evening in question, he saw the hook and ladder truck going south on Brewer street.   Being asked to tell the jury what he saw with reference to the truck and the accident, he testified as follows:

"A. I saw the truck coming down on Brewer street going south, and just as it hit Charlotte street it got in the car track.   I heard a kind of noise, and I thought he hit a hole.   The first thing I saw he was right on the sidewalk, and I went down and asked who was hurt and somebody told me there was a man hurt. I went up on the porch and saw a man lying there with his foot crushed.   I carried him in and gave him first aid.   We have instructions.   We fixed his leg up and carried him to the hospital.

"Q. You gave him first aid, you say?

"A. Yes, sir.

"Mr. Venable: I object to so much of this evidence as is clearly the expression of an opinion in which the witness said that he heard a noise and thought that he hit a hole.

"The Court: Strike out what he thought.

"By Mr. Wolcott:

"Q. What did you see when you heard the noise—what did you see the truck doing?

"A. There is a frog on the corner of Charlotte street, and he got into the frog, and he couldn't get out. He couldn't control it. The driver did his best to get out.

"Q. When he couldn't get out which way did he head for?

"A. He was headed on the right—he wanted to get on the right side of the street.

"Q. After it struck Charlotte and Brewer do you remember which way it went first?

"A. Which way first?

"Q. Towards the side—

"Mr. Venable: Let him say.

"By Mr. Wolcott:

"Q. Do you remember which way it went first after it struck the corner there?

"A. Do you mean just before the accident?

"Q. Yes.

"A. The only thing I noticed after he hit the frog on the corner of Charlotte street he got into the track, and he did the best he could to get out, and the next thing I saw he hit the sidewalk. That is the best I can remember.

"Q. When you say he hit the frog, what noise, if any, did the truck make at that time?

"A. Just the same as a very heavy truck. It hit that hole hard and I heard that.

"Q. Was the noise loud?

"A. It was loud enough to be heard on the corner where I was standing."

On cross-examination he further testified as follows:

"Q. When you got up to the corner, did you stop in that store at all?

(*This answer was left out of the printed record*).

"Q. You never left the sidewalk?

"A. No, sir.

"Q. And the only truck which came by was the truck which went into the sidewalk?

"A. That is the only one that I know of, and then the fire chief came along a few minutes later, after the accident.

"Q. I suppose after the accident a number of people came.   But you were west on Charlotte street?

"A. Yes, sir.

"Q. When you got close to the corner of Brewer you saw the fire truck coming?

"A. Yes, sir.

"Q. And that was the first fire apparatus that had come up there?

"A. Yes, sir.

"Q. And you say you heard a noise?

"A. Yes, sir.

"Q. You were not, yourself, expecting an accident?

"A. No, sir.

"Q. And there was no interest for you to be looking what part of the street the truck was running in?

"A. I noticed which side of the street he was on.

"Q. Which side of the street was he on?

"A. The right-hand side of the street going south.

"Q. He was on the right-hand side, you say, of Brewer street, going south?

"A. Yes, sir.

"Q. And you were on Charlotte street near the other corner?

"A. Yes, sir.

"Q. What kind of noise did you hear?

"A. What kind of noise did I hear?

"Q. Yes.

"A. I heard a noise just like a truck would go into a hole.

"Q. Just as if it would go into a hole?

"A. Yes, sir.

"Q. You did not see any truck go into the hole, but judging from the noise is what you meant; isn't that correct?

"A. Yes, sir.

"Q. And your whole testimony as to going into a hole is your judgment based on the noise it made; you never looked at it; you didn't have any interest to do it?

"A. I didn't pay particular attention.

"Q. You heard a noise as it crossed these tracks?

"A. Yes, sir.

"Q. And you didn't see where the wheels were, but you were looking at the driver or at the man up on the tiller?

"A. I was just looking at the truck.

\*      \*      \*      \*      \*      \*      \*      \*

"Q. The truck passed you; you heard a rumbling noise as it passed you, and the next thing you knew it was in the house?

"A. Yes, sir.

"Q. How quick was it?

"A. Quicker than I can tell it.

"Q. Quicker than you can tell it?

"A. Yes, sir.

"Q. It went upon the porch and knocked the fence down?

"A. Yes sir.

"Q. How soon did you get there to give first aid?

"A. Just as soon as I could.

"Q. Of course, if any other trucks passed down the street you would have been bound to see them because they were directly in your line of vision?

"A. Yes, sir.

"Q. And you are positive none went down ahead of this one?

"A. Yes, sir

\*    \*    \*    \*    \*    \*    \*

"Q. I know you wouldn't. You don't remember whether it was, or not. Now, who was it that put into your head to come here and express an opinion about a frog and a wheel getting hung into it? When did you first get that into your head that had something to do with it? You didn't see it, you say?

"A. No, sir; I didn't see it before the accident, but after I went to the hospital with the man who was hurt I went back up there.

"Q. You came back?

"A. Yes, sir.

"Q. Then all your testimony about that is making an estimate or guessing at what happened by what you saw afterwards, and not by what you saw at the time?

"A. I didn't expect that frog to cause the accident, but after the accident I went down there to see just what was wrong—more to investigate, and I met the man's brother. He asked me if I was the man who took his brother to the hospital.

"Q. You went up on the street to see if you could figure out what had happened?

"A. Yes, sir.

"Q. You don't even know one of these wheels passed over the frog. Suppose the driver of the truck should say that he was coming down straddling the rail, the wheel wouldn't have touched the frog?

"A. Why wouldn't it?

"Q. You think it got in the frog?

"A. The man caught in the frog and tried to get out.

"Q. You are guessing at that?

"A. Yes; I know that.

"Q. You know that, although you didn't see it?

"A. After he put the truck out of the sidewalk the driver took the steering wheel and spun it.

"Q. Do you mean the steering wheel was out of commission?

"A. It would not work.

"Q. You mean after it went out and butt the porch down it wouldn't work. Do you mean it had too much play in it?

"A. I judge the steering knuckle broke.

"Q. The steering knuckle broke and that caused the accident?

"A. I think he made too much of an angle.

"Q. So you think the cause of the accident was the steering knuckle breaking?

"A. He got into the track and couldn't get out.

"Q. How do you know that he couldn't get out?

"A. I could see it."

On the part of the defendants, five witnesses testified as to the occurrence itself. These were the driver of the truck handling the steering wheel in front, the fireman on the running board near the middle of the truck, the tillerman, handling the steering wheel at the rear of the truck, and also two witnesses who saw the accident, one standing on the southeast corner and the other standing in the door of a shop next to the southwest corner on Brewer street, there being one house between his place and the house at which the accident occurred. The last mentioned witness, after stating that he con-

conducted an electrical business at the place mentioned, testified as follows:

"Q. Where were you at the time this fire truck came down and just before the accident?

"A. I was standing in my shop door when this truck crossed Brewer street.

"Q. Your shop door is then the second store from the corner coming down this way on Brewer street, on the west side of the street?

"A. The second; yes, sir.

"Q. Where did this automobile skid or change its course in any way?

"A. Just about, I would say, six or eight or ten feet beyond my shop door. There was a car sitting there, and it seemed as if the truck was a little to the left side of Brewer street about two feet.

"Q. Which side did you say?

"A. The west side, I would say. Gentlemen, it looked to me as if he cut out to the east side of the street, and then he cut back, and there was a car there, and he just blazed the fender on the left-hand side of the car.

"Q. You mean the parked car?

"A. Yes, sir.

"Q. Which wheels of the fire truck skidded?

"A. The middle wheels.

"Q. Did they skid towards you or from you?

"A. They skidded towards me.

"Q. How close was that right-hand wheel to the car track when it commenced skidding?

"A. I would say about two feet.

"Q. Toward you from the car track?

"A. Towards me.

"Q. What is the condition of that street along there? Is it perfectly level or sloping?

"A. No, sir; it is a little sloping.

"Q. Does it slope from you or towards you?

"A. Well, from me and towards me. It is a little rounding.

"Q. When the truck came across Charlotte street and down towards you, had it changed its course at all until it got to your store?

"A. It looked to me like when he cut out for the automobile.

"Q. How close was he to the back of the automobile when he cut out to the left?

"A. I would say about fifteen or twenty feet probably.

"Q. Were there any marks on the street to show where those wheels skidded?

"A. There were. There was just a little mist of rain that evening. I walked out of the shop after the truck had gone up on the sidewalk. I heard such a tear-up— I was getting ready to lock up, and I noticed particularly where the wheels skidded, and I looked all around.

"Q. You say it skidded two feet; how much further was it that it skidded?

"A. That is where it skidded. It was further the other way.

"Q. Did it do any skidding or turning at Charlotte street when it crossed the curved tracks?

"A. No, sir; it came almost perfectly straight.

"Q. How far did the skid mark on the street go along before it righted up?

"A. It showed twelve feet.

"Q. That is up and down the street?

"A. Up and down the street.

"Q. And it started at a point two feet from the rail and skidded towards you?

"A. Towards the west side of the street."

[1] The account of the accident given by the witness, Burton, in the testimony just described is confirmed by the other four witnesses for the defendant, although they do not agree in every detail. It is sufficient to say, without undertaking to state their testimony at length, that it coincides with Burton's testimony in the material particulars as to the manner in which the accident occurred. According to their testimony, the hook and ladder truck, in coming out of Bute street into the narrow roadway of Brewer street and making the left-hand curve, naturally came down Brewer street on the right-hand side, straddling the rail of the track, crossing the connecting track at Charlotte street; then the driver in front, upon observing the automobile parked on his right, turned out to the left, whereupon the driving wheels skidded and struck the fender of the automobile, the skidding causing a rapid deflection of the truck to the left, which caused the driver to turn his wheel quickly to the right, and before he could adjust the turning of the truck properly, his front was thrown up across the pavement. The truck had three sets of wheels, the front set subject to the steering wheel of the driver, the rear subject to the steering wheel of the tillerman, the middle set being driving wheels. The width of the truck from hub to hub was seven feet, three and three-quarters inches.

It is insisted by the plaintiff that the evidence is sufficient to establish the fact that the crash heard by the witness occurred at the corner and was caused by the wheels of the truck passing over a frogplate and then dropping into worn places in the street immediately next to the rail, thus causing the truck, by reason of the wheel becoming imbedded in one of the holes, to be deflected and zigzag on the street so that it crossed the sidewalk and injured the plaintiff. It is insisted by

the defendants that the evidence for the plaintiff is vague and speculative and is not sufficient to overcome the direct and positive evidence of five witnesses that the accident occurred otherwise.

It is quite manifest from the evidence that the crash or noise, testified to by some of the witnesses as having been heard by them as the truck crossed Charlotte street, was occasioned by the truck running across the rails of the track coming into Brewer street from Charlotte street. A hook and ladder truck is one of the heaviest makes of auto vehicles, the one in question here weighing between nine and ten tons. As this truck, with its complement of ladders, crossed the rails of the track at Charlotte street, it would naturally produce a rattling noise.

The court is satisfied that it was in fact physically impossible for the heavy truck to have been diverted from its course as it was crossing Charlotte street, and for one of the driving wheels to have been caught in a depression along the rail of the track on Brewer street, as endeavored to be shown by the witness, Marino, and contended for by the plaintiff. The tread of the driving wheel of the truck was eight-and-one-half inches in width, consisting of two solid rubber tires of four inches each, with about half an inch between the two tires. In our opinion it was not at all practicable for the driving wheel of the truck to have been caught in the frog at the junction of the two tracks. It is not at all clear what the witness, Marino, meant when he stated that the truck "got into the frog" and couldn't get out, and the driver couldn't control it; that "after he hit the frog on Charlotte street he got into the track, and he did the best he could to get out;" that "just as it hit Charlotte street it got into the car track. I heard a kind of noise and I thought he hit a hole." It was testified

that the plate of the frog was somewhat depressed below the level of the street, but there was no reason why the wide wheels of the truck should not have run across this frog, with a bump, perhaps, but no further inconvenience than running over street car tracks at any other point.   The wearing away of the asphalt pavement adjoining the sides does not seem to have been greater than is constantly occurring in all large cities. According to the testimony, the largest "hole" was about two inches in depth and four inches wide.   It is certainly most improbable, if not impossible, that a wide wheel of this moving truck, with the added momentum of its own weight, could have become caught or embedded in such a depression so as to have affected the control of the driver over the machine to the extent that is claimed.

[2] We have given a careful study to the entire evidence, and are convinced that the witness, Marino, did not actually see the wheels of the truck get caught at or near the corner, and so throw the truck out of its course; but that, not having seen the car parked between the corner and Mrs. Brophy's house, on an inspection of the scene of the occurrence in order to ascertain how it took place, he reached the conclusion to which he testified. The defendants assailed the credibility of the testimony of this witness, but we think it may be said that in endeavoring to account for the accident, with a feeling of sympathy for the plaintiff, ·he convinced himself, so far as he had knowledge of the occurrence, that it did occur as he said.   Such evidence, however, is not affirmative, and is without proper probative value.   No one can read the entire testimony of Marino without concluding that he did not actually see what he testified to, but was giving inferences drawn by him from his examination of the place of the accident afterwards.   Such inferences

are not, in a case of this character, facts.   The burden rests upon the plaintiff to establish the negligence of the defendants, in a case of this nature, by evidence having sufficient probative value to allow of a conclusion, drawn from the testimony as to the facts, to be made that the negligence fairly appears.

As to the evidence of Marino, taken as whole, see *Davis* v. *Souder*, 134 Va. 356, on p. 361, 114 S. E. 605; *Washington-Virginia Ry. Co.* v. *Struder*, 132 Va. 368, on pp. 373 and 375-6, 111 S. E. 239.

In the instant case the trial judge set aside the verdict for the plaintiff, and under section 6251 of the Code entered judgment for the defendants.

[3] The most recent case, in which the appellate court considered the evidence upon a writ of error to a judgment under these circumstances, is found in *Ricketts* v. *J. G. McCrory Co.*, decided March, 1924, and reported in 138 Va. 548, 121 S. E. 916.   Judge Burks, in that case, says, at page 920: "A verdict which has been disapproved by the trial judge is not entitled to the same weight on appeal as one that has been approved by him. *DuPont* v. *Taylor*, 124 Va. 766, 98 S. E. 866.   The very fact that he is given the power to set aside a verdict as contrary to the evidence necessarily means that he must, to some extent at least, pass upon the weight of the evidence. 'It would, indeed, be a futile and idle thing for the law to give a court a supervisory authority over the proceedings and the manner of conducting a cause before the jury, and the right to set aside the verdict of the jury therein because contrary to the evidence, unless the judge vested with such power could consider, to some extent at least, the evidence in the cause;   *   *   *. ' *Cardwell* v. *Norfolk & Western R. Co.*, 114 Va. 500, 506, 77 S. E. 612, 614.   But this does not mean that he can set aside a verdict merely because, if on the

jury, he would have found a different verdict.  He must
be satisfied from the evidence adduced either that there
was no evidence to support the verdict, or that the ver-
dict was plainly contrary to the evidence.  This con-
clusion must be drawn from the whole evidence in the
case, but in arriving at his conclusion, it has somewhat
more latitude than this court would have in passing
upon a verdict that was sanctioned by the judgment of
the trial court.   *Chapman* v. *Va. Real Estate I. Co.*, 96
Va. 177, 31 S. E. 74; *Davis* v. *McCall*, 133 Va. 494, 113
S. E. 835; *Forbes & Co.* v. *Southern Cotton Oil Co.*, 130
Va. 245, 108 S. E. 15.''

[4] It is incumbent upon the plaintiff in error here to
show error on the part of the trial judge in setting aside
the verdict and entering judgment on the evidence.
We do not think that has been done.

[5] In our opinion, however the evidence may be con-
sidered, the testimony is not sufficient to show that the
judge erred in setting aside the verdict and rendering
judgment as he did.   The actual facts testified to by
the plaintiff's witnesses are not so in conflict with the
leading facts testified to by the defendants' witnesses as
to preclude the evidence for the defendants altogether
from being considered.   In this view of the case, it is
clearly brought within the purview of the decisions in
such cases as *General Accident Ass'n* v. *Murray*, 120 Va.
115, 90 S. E. 620, and *Honaker* v. *Whitley*, 124 Va. 194,
97 S. E. 808, in which it was held that where damages
are sought for injuries which may have resulted from
one of two causes, for one of which the defendant is re-
sponsible and for the other of which he is not responsi-
ble, the plaintiff must fail if his evidence does not show
that his injuries were produced by the former cause; and
he must also fail if it is just as probable that the in-
juries were caused by the one as by the other, since the

plaintiff is bound to make out his case by a preponderance of the evidence. The most that can be said in the instant case, as between the two theories of the respective parties, is that it is just as probable that the injuries were caused by the driver of the truck trying to steer out of the way of the parked car and the consequent skidding of the truck, as it is that the accident occurred from a wheel of the truck becoming imbedded in a hole between the rail and the side of the track, in the street adjoining the rail, and so throwing the truck out of its course and causing it to zigzag.

There was a motion made by the defendant in error to dismiss the writ of error on the ground that the evidence had not been properly certified and made part of the bill of exceptions, and therefore, it was not to be taken as a part of the record before this court. There were also other errors assigned by both sides, in addition to the correctness of the decision of the trial judge in setting aside the verdict and rendering judgment for the defendants. Our conclusion renders consideration of these matters unnecessary.

The learned judge of the trial court saw the witnesses and heard them testify, and we are of opinion that the judgment of the court is correct and it will accordingly be affirmed.

*Affirmed.*